People *v.* Worthington.

THE PEOPLE, Plaintiffs in Error, *v.* THOMAS WORTHINGTON, Defendant in Error.

APPEAL FROM PIKE.

The legislature has the right, under the constitution, to impose a tax upon all credits, whether for land sold, and unpaid for, or otherwise. Money loaned, as also money due for land, is taxable, whether the land has been conveyed or not.

THIS is a case arising under the revenue laws of this State, and comes up from the county of Pike. It appears by the papers filed in this case that the defendant sold several tracts of land previous to April 1, 1857; that part of the purchase money was paid down, and notes taken for the payment of the balance; that Worthington executed bonds for deeds in some cases, and in others, deeds, and took mortgages.

That none of said lands were taxed in the name of said Worthington for 1857, but in the names of the purchasers.

That Worthington refused to list said notes for taxation for 1857; that the assessors of the town of Pittsfield, thereupon assessed against said Worthington, for moneys and credits, $60,000, and notified him thereof, and of the time and place of the meeting of the board of reviewers.

At the meeting of the board of reviewers said defendant appeared, refused to make affidavit as to the value of said notes, but offered to exhibit said notes and the contract upon which they were made, and filed with said board his protest. The board thereupon reduced the assessment to $26,314.

That said Worthington took an appeal to the board of supervisors to their September meeting, 1857; which board, at their September meeting, 1857, made a total abatement of the above assessments.

The lands above referred to, were sold for between thirty-five and forty thousand dollars.

The action of the board of supervisors and the facts herein, were then certified to the auditor of public accounts, by the county clerk of Pike county, October 16, 1857.

The petition of the defendant to the board of supervisors states, that if defendant were compelled to pay tax on the notes he would be subject to double taxation, as he was bound to see that the taxes on said lands were paid, or lose his lien thereon, retained to secure the payment of the notes, etc.

The auditor thereupon notified the county clerk of Pike county, of his objections to the decision of said board of supervisors, and of his intention to apply to this court to have their decision set aside, under the provisions of the revenue laws.

This case has been twice argued in this court.

It is insisted on the part of the auditor, that the notes are taxable property, and were properly listed or assessed for taxation, and that the board of supervisors erred in abating or cancelling said assessment.

J. B. WHITE, and LOGAN & HAY, for the People.

J. WORTHINGTON, *Pro se.*

CATON, C. J. The second section of the ninth article of the constitution declares that: "The General Assembly shall provide for levying a tax by valuation, so that every person and corporation shall pay a tax in proportion to the value of his or her property." . The first question to be considered is, what is meant by the word property, as here used? What did the framers of the constitution intend to make the subjects of taxation? The word property is not alone used in our language to denote tangible things, but is properly applied to denote intangible rights of value. One may have a property in a patent right or a copy right, which is as much ideal as is a right of action. We may safely assume that it was the policy of the convention which framed this clause of the constitution, that each person pay a direct tax in proportion to the pecuniary interests which he has in the State, and to be protected and defended by the laws. While this policy dictated the clause, it must have been known that to do so absolutely, was impossible. No system of revenue laws was ever yet framed, and none can ever be framed, which will practically carry out this system in perfection. A thousand insurmountable difficulties intervene to prevent its impartial execution. Some properties are so intangible that they cannot practically be reached, or so imaginary in value that they cannot be justly estimated. This may be so of a copy right or a patent right or a franchise, all of which may have value, and are, therefore, properties; and yet, so far as we are advised, no State has ever undertaken to make them the subjects of direct taxation. The convention must have known that a requirement of the legislature, to enumerate as the subjects of taxation, every thing, and every right, and every claim which might properly be termed property, and to enforce from it a direct revenue, in proportion to its actual intrinsic value, could never be complied with, and the most that could have been intended was, that it should approach as nearly to it as was practicable. To require it absolutely is utopian, and not to be attained by mortals. The more, however, it is found practicable to subject all to this direct tax, the nearer is this consti-

People *v.* Worthington.

tutional requirement approached, and consequently it is impossible to conceive of a constitutional objection that it has embraced any species of property which it is practicable to assess, by fixing a determinate value upon it. And yet such is one, if not the principal objection here. If the objection be that notes and mortgages, and other securities for moneys due or to become due, are made the subjects of taxation, the objection can only be sustained upon the ground that the rights evidenced by such papers, are not property. This is to assume that it was the intention of the convention to use the word property in its most limited sense, as embracing only things physical and tangible. Thus to limit the subjects of taxation would establish an inequality more unjust and oppressive than any thing which is ever likely to occur from the system adopted by the legislature under the constitution. The burthens of taxation would then fall upon those who are least able to bear them, while those who would be the least incommoded by the payment of taxes, would escape altogether. At least, this would be the case to a very great extent. Those whose fortunes are invested in money loaned, and whose income is the interest thereof, while they require as much the protection of the government, and are more expense to it in the enforcement of their rights, than any other class of citizens, shall these escape taxation altogether, and those to whom the money is loaned, and who have invested that money in lands and stock, and other tangible property, be required to bear the whole burthens of the State? The very statement of the proposition must shock the sense of right and justice of every man. Such never could have been the design of our constitution. The constitution means as it declares, that each shall pay a tax in proportion to the property which he has, whether that property consists of farms or mortgages; of visible substances or choses in action. It is not to be denied that this rule of taxation must in some, nay, in many instances, operate unequally and even oppressively; and such may be the case of the defendant here. He sells a piece of land and gives a deed, and takes notes and a mortgage to secure the purchase money. He is taxed for the amount due on the mortgage, and the purchaser is taxed for the land, and if the purchaser neglects to pay these taxes, then the seller must do it himself or lose his security. This is a hardship, no doubt, but like many other hardships which befall mankind, it results from the failure of another to perform his duty, and must be provided against by greater caution in selecting a purchaser, or in seeking satisfaction of him, for the taxes paid on the land. It may be true, in one sense, to say that it is double taxation to tax the horse which is sold and also the note which is given for the purchase

money; and so is it to tax the note which is given for one hundred dollars borrowed money, and also the money which is borrowed; and so we might go on throughout the whole system of human transactions which involves a credit for things tangible, which are within the State and subject to taxation; and even so it is, if they are beyond this State, for the presumption is that they are taxed wherever they may be. Whatever rights, credits or choses in action which may be taxed, are so much over and above the money and other physical objects within the State, and are in the same sense, double taxation; for those very credits must ultimately be paid with those physical objects, if they are ever paid. To say there shall not be double taxation in this sense of the term, is at once to say that no credits of any sort shall be taxed; and all those whose fortunes consist in loaned money or other credits, must be allowed the benefit and protection of the laws, and be exempt from the burthens incident to the making and enforcing them. If, in any country, this has been deemed just and equal, such is presumed not to be the case generally, where direct taxation is resorted to.

It can hardly be necessary to say anything in vindication of the right of the people, in their primary capacity when framing their constitution, to exempt from taxation or to tax, either rights or credits, or any other interest or property. No provision of the Federal Constitution has been referred to, restraining the exercise of such right by the people of the State; nor is there any compact between the Federal and State governments forbidding it; and if not thus restrained or forbidden, the right of taxation in the State is as absolute and unrestrained as it is in the parliament of Great Britain, or in any other government. Although we might think that the provisions of the constitution on the subject of taxation are unjust and unequal, or even arbitrary and oppressive, neither the legislature nor the courts can, for any such reason, disregard them. It is the duty of all to bow to the supreme majesty of the constitution, as embodying the will of the people by whom it was adopted. The only legitimate inquiry upon this point then is, what is the true meaning of that portion of the constitution which confers upon the legislature the taxing power?

To ascertain what was intended to be embraced within the meaning of the word property, it is proper to remark that the same word was used in the old constitution and in the same connection. The corresponding provision in the old constitution was in these words: " That the mode of levying a tax shall be by valuation, so that every person shall pay a tax in proportion to the value of the property he or she has, in his or her possession." In order to bring the two directly together, it may be well to

repeat the quotation from the new.  It is this: "The General Assembly shall provide for levying a tax, by valuation, so that every person and corporation shall pay a tax to the value of his or her property." If there be any difference in the two provisions, that in the new constitution is the broadest, the first only in terms subjecting property *in possession* to taxation, while there is no such restriction in the last.  We will now examine what meaning was given to the word property during the thirty years the old constitution continued in force.  The first section of the old revenue law, under that constitution, was this: "All property, real and personal, within this State, shall be liable to taxation, subject to the exceptions hereinafter stated."  The third section is as follows: "The term personal property, shall be construed to include all household furniture, goods and chattels, all ships and vessels, whether at home or abroad, all moneys on hand and moneys loaned, whether within or without the State, all public stocks, stocks in turnpikes, bridges, insurance companies and moneyed corporations; also, all commissions, and every species of property not included in the description of real estate." With this broad, though proper, explanation of the meaning of the word property before them, showing how it had been understood and applied in the old constitution, when the same word was used in the same connection by the convention which framed it, can any one doubt how they intended it should be there understood?  Had they intended that it should there receive a more restricted meaning than had been ascribed to it in the old constitution, they would, beyond doubt, have distinctly expressed such intention.  Their silence on the subject is equivalent to an express declaration that the word should continue to have as broad a signification as had been before given to it.  But, as if to silence all cavil or dispute about the power of the legislature to impose a tax upon everything of value, whether tangible or intangible, the last section of the same article of the constitution provides as follows: "The specifications of the objects and subjects of taxation, shall not deprive the General Assembly of the power to require other objects and subjects of taxation to be taxed in such manner as may be consistent with the principles of taxation, fixed by this constitution."  The principle of taxation here referred to is, undoubtedly, the *ad valorem* principle, except in the cases specified in the last part of section two of the ninth article, where the legislature is authorized to depart from the *ad valorem* principle.

With such unmistakeable evidence of the intention of the convention, as to what they intended to authorize and even require to be taxed, we cannot doubt, and probably no one else

will doubt, that the legislature had authority to impose a tax upon all debts according to their real value. Of the right of the people to confer this power upon their legislature, by their constitution, we have already spoken, and will again refer to it, presently.

After the most careful consideration which we have been able to give this subject, with the assistance of a second argument of the cause, we are very clearly of the opinion, that the legislature had the right to impose the tax upon all the rights and credits which were due to the defendant, as well as to those due to all others.

We have thus far considered this question as if it were now for the first time presented to this court for its consideration. Such is not the case. It has, in fact, been already twice decided by this court. The first is the case of *Trustees, etc.* v. *Mc Connell*, 12 Ill. R. 138, where we held that money loaned was a proper subject of taxation. It was held to be property under our constitution. Again, in *The People, etc.* v. *Rhodes*, it was held, that money due for land sold by contract, but not conveyed, was the proper subject of taxation, as well as the farm, the title to which Rhodes still held for the security of the purchase money. The objection in this last case, like the one before us, was, that it was a double taxation; but a little reflection will show that it was no more so, than in the case of loaned money, or credit given for any other consideration. Take the case of loaned money: there the money in the hands of the borrower, as well as the credit or evidence of the debt in the hands of the lender, is taxed, and that is in the same sense a double taxation. And so of any other credit given for any other consideration. The credit is taxed in the hands of one, and the thing or subject matter for which the credit was given, is taxed in the hands of the other. Whenever a credit is given, a new *property* is created in the hands of the creditor, which before did not exist, and when the debt is paid, that property is annihilated. This is a kind of property which is not the product of manual labor. When political economists speak of property as the product of physical labor, they can only mean physical property; and they cannot refer to this ideal property, which is created only by the giving of credit. And yet, this last is embraced within the true definition of property as expounded by all law writers and lexicographers. It is synonymous with estate, when applied to or speaking of human wealth. A man may be as truly worth a thousand dollars, or have wealth to that amount, when *it* consists of well-secured credits, as when it consists of lands or coin. The man who has a farm worth a thousand dollars, sells it to one who has nothing, and

takes his bond and mortgage for the purchase money; he is no poorer by the operation. He is still worth the thousand dollars, although it is in a different form. Then his wealth consisted in a physical, tangible object—the farm—now it consists of an intangible, ideal subject—the credit—but he is, nevertheless, as rich as he was before; and for this wealth, in this form, may be as justly taxed now, as then. It may be true that the purchaser is no richer than he was before, but still he may be taxed for the farm which he owns and has in his possession, although he owes as much for it as it is worth. It is undoubtedly true, that both together are now worth no more in the aggregate than they were before, while in fact they are together taxed to twice the amount which they were before. Here, then, is, if you please, a double taxation, when you aggregate the entire interests of the two, and view them as concentrated into the hands of one representative, but this right of double taxation is not so hostile to the natural right of the citizen or subject, so shocking to our sense of justice, and so subversive of divine law, as to forbid its adoption in the fundamental laws of civil society. Nay, so far from this, its reasonableness and justice have so commended it to the general sense of propriety of mankind, that it has generally, if not universally, been adopted in civilized states, as well the most free, as the most despotic; and that, too, without a murmur of complaint, even by those great and enlightened statesmen and jurists, who laid so deep and substantially the foundations of this Republic, or who have framed the constitutions of the several States. It is not for the courts to say, that the advancement and enlightenment of the present day, have so far dispelled the clouds which obscured the understandings of those who have gone before us, that we may say, the exercise of this right was but a usurpation of power by society itself, which no time could sanction and no acquiescence could approve. It is beyond dispute or cavil, that it was the intention of the framers of the constitution that the property in credits should be taxed, and that they intended, not only to sanction, but to enjoin this sort of double taxation, and the whole is reduced to a question of power in the people, in adopting their organic law, thus to declare. Of their power so to do, we cannot doubt. It is not for us to question or to vindicate the policy which dictated this provision. With all those arguments, the object of which is to show that the true principles of political economy have been violated in thus taxing trade and commerce, the transfer of property on credit, and the loaning of money, by those who have not the industry or the capacity to profitably use it, and thus enrich the State, to those who possess both, we have nothing to do. Ours is the more

12

humble province of determining the true intent and meaning of the law makers, when they enact within the pale of their power. We have no doubt that the people had the right, in framing their constitution, to direct this tax to be levied, and that the legislature when imposing it, but carried out the intention of the constitution in letter and in spirit.

The judgment below is reversed, and the judgment of the Board of Reviewers is affirmed.

*Judgment affirmed.*