## Barney Youngblood and others v. Jared Sexton.

*Equity jurisprudence: Personal tax: Injunction: Liquor tax law.* The tax imposed by the liquor tax law of 1875, being a personal tax merely, its collection could not be enjoined, even though it were illegal; the ordinary legal remedies being sufficient for such cases.

### YOUNGBLOOD *v.* SEXTON.

*Jurisdiction: Acquiescence of parties.* The failure of the defendants in a suit to enjoin such a tax to object to the jurisdiction, cannot confer authority upon the court to consider the merits.

*Public interests: Questions of construction of statute.* But the equity court having fully considered the case and made a decree from which appeal is taken, and the defendant being a public officer, and the suit having had the effect to delay the enforcement of a public law, it is deemed proper to express an opinion on the merits, notwithstanding the want of equitable jurisdiction.

*Equity jurisprudence: Irreparable injury: Tax on business.* A tax on a business cannot be enjoined on the ground of possible inability of the parties to pay it, whereby it may work irreparable injury by breaking up their business. The enforcement of any tax may possibly work an injury of this nature.

*Multiplicity of suits: Distinct interests: Equitable interference.* Parties severally taxed, and having no common interest except in the question of law which is involved, cannot unite to have the tax enjoined on the ground of preventing a multiplicity of suits, when their cases severally present no ground for equitable interference.

*Taxation: State specific tax: Local purposes.* A tax on a business of a specific annual sum is not a *state* specific tax when it is assessed and collected locally and appropriated to local purposes, though collected under a general state law.

*Taxation: Uniformity: Apportionment of taxes.* It is not a valid objection to a law imposing a tax on business, that its operation will not be uniform or just, because not assessed in proportion to the business done. Apportionment of taxes is purely a legislative function, and the levy of the same sum on all carrying on the business is at least uniform, and the courts are not to inquire into its justice.

*Local taxes: Governmental purposes: Municipalities: State interests.* The municipalities have no inherent right to decide for themselves what taxes shall be levied for the general purposes of local government, and it is not therefore a valid objection to local liquor taxes that the municipality is not consulted in their levy.

*Constitutional law: Officers: Collecting taxes: New duties: Police regulations: Legislative authority.* Local officers entrusted with the collection of taxes generally have no vested constitutional right to collect taxes which are provided for by law after the constitution was put in force; and such new taxes may be collected by other officers as the statute may provide. And this principle is specially applicable where, as in the case of the liquor tax of 1875, the tax is imposed in part for purposes of regulation, in which case the legislature has an undoubted right to make whatever provisions are deemed essential to prevent the law being nullified in any part of the state.

*Constitutional law: Licenses: Taxing liquor traffic.* The constitution (Art. IV. § 47) prohibits the legislature from authorizing "the grant of license for the sale of ardent spirits or other intoxicating liquors." This does not preclude taxing the liquor traffic, a tax not being a license, in either the legal or common understanding of that term, and the payment or non-payment of the tax not affecting the right to carry on the traffic, which, since the repeal of the prohibitory liquor law, is lawful whether the tax is paid or not.

*Taxing a business: License: Protection: Approval: Police purposes.* A business is not necessarily licensed or protected because of its being taxed, nor does taxing a business imply an approval of it. On the contrary, it is competent to tax an illegal business, and a tax on a business

not prohibited is often, where police purposes are had in view, a means of expressing disapproval of it.

*Heard October 5 and 6.    Decided October 12.*

Appeal in Chancery from Superior Court of Detroit.

*Romeyn & Weir* and *F. A. Baker*, for complainants.

*George H. Prentis, C. A. Kent* and *Andrew J. Smith, Attorney General*, for defendant.

COOLEY, J :

The bill in this cause was filed to restrain the collection from the several complainants of a tax assessed against them separately, in respect to the business in which each is engaged.    It is a personal tax purely.    It was decided at an early day in this state, that equity had no jurisdiction to restrain the collection of a personal tax, even conceding it to be illegal; the ordinary legal remedies being ample for the party's protection.—*Williams v. Detroit, 2 Mich., 560.*    The principle has ever since been regarded as not open to controversy in this state, and it was applied without its soundness being contested in *Henry v. Gregory, 29 Mich., 68*, decided last year.   In other states it is supported by a strong preponderance of authority.—*Brewer v. Springfield, 97 Mass., 152; Durant v. Eaton, 98 Mass., 469; Loud v. Charlestown, 99 Mass., 208; Whiting v. Boston, 106 Mass., 89; Hunnewell v. Charlestown, 106 Mass., 350; Rockingham Savings Bank v. Portsmouth, 52 N. H., 17; Dodd v. Hartford, 25 Conn., 232; Ritter v. Patch, 12 Cal., 298; Berri v. Patch, 12 Cal., 299; Worth v. Fayetteville, Winst. Eq. (N. C.), 70; Van Cott v. Supervisors, 18 Wis., 247; Greene v. Mumford, 5 R. I., 472; McCoy v. Chillicothe, 3 Ohio, 370; Connolly v. Chedie, 6 Nev., 322; Deane v. Todd, 22 Mo., 90; Sayre v. Tompkins, 23 Mo., 443; Barrow v. Davis, 46 Mo., 394; McPike v. Pew, 48 Mo., 525; Brooklyn v. Meserole, 26 Wend., 132; Intendant v. Pippin, 31 Ala., 542; Baltimore v. Balti-*

*more & Ohio R. R. Co., 21 Md., 50; Dows v. Chicago, 11 Wall., 109; Hannewinkle v. Georgetown, 15 Wall., 547.*

The question then presents itself, how this bill came to be filed, and on what ground the superior court was asked to and did proceed to render a decision on the merits. The jurisdictional question has not been argued in this court, but we are not inclined to pass it over in silence, thereby giving countenance to the idea, that by the mere acquiescence of parties a jurisdiction may be made for a court of chancery, by means of which the extraordinary remedy by injunction can be made use of to restrain public officers in their action, where neither the legislation of the state nor the general principles which control the action of courts have ever given this remedy. The writ of injunction is peculiarly liable to abuse; and the practice of resorting to it in cases where it is not allowed by law, relying upon the opposite party to overlook or waive the illegality, is not one that can safely be encouraged or sanctioned. The jurisdiction of courts is never subject to be enlarged or diminished at the discretion of parties; and it would be peculiarly mischievous to permit jurisdiction to rest upon consent or waiver in cases where general public interests are to be affected by the litigation.

The grounds suggested, but not argued, as giving equitable jurisdiction in the case, are, *first*, that thereby a multiplicity of suits may be avoided; *second*, that otherwise the proceedings may ripen into a cloud upon the title to complainants' land; and, *third*, that irreparable injury is threatened to complainants in their business. As the tax is only personal, and as yet affects no real estate, and may never do so, the second ground calls for no consideration. The force of the third must rest in the fact that enforcing the tax may in some cases compel the suspension of business, because it is more than the person taxed can afford to pay. But if this consideration is sufficient to justify the transfer of a controversy from a court of law to a court of equity,

then every controversy where money is demanded may be made the subject of equitable cognizance. To enforce against a dealer a promissory note may in some cases as effectually break up his business as to collect from him a tax of equal amount. This is not what is known to the law as irreparable injury. The courts have never recognized the consequences of the mere enforcement of a money demand as falling within that category. It is true the federal courts have treated the unlawful taxation of a franchise as a case of possible irreparable injury.—*Osborn v. United States Bank, 9 Wheat., 738.* But this was on the ground that the tax, if enforced, might destroy the franchise, and in effect the corporation itself,—the artificial person which was taxed,—and the case has little analogy to that of the taxation of a particular business carried on by individuals.

If complainants rely upon the jurisdiction of equity to take cognizance of a controversy where thereby a multiplicity of suits may be prevented, the reliance fails, because the principles that govern that jurisdiction have no application to this case. It is sometimes admissible when many parties are alike affected or threatened by one illegal act, that they shall unite in a suit to restrain it; and this has been done in this state in the case of an illegal assessment of lands.—*Scofield v. Lansing, 17 Mich., 437.* But the cases are very few and very peculiar where this can be permitted, unless each of the complainants has an equitable action on his own behalf. Now, the nature of this case is such that each of these complainants, if the tax is invalid, has a remedy at law which is as complete and ample as the law gives in other cases. He may resist the sheriff's process as he might any other trespass, or he may pay the money under protest, and at once sue for and recover it back. But no other complainant has any joint interest with him in resisting this tax. The sum demanded of each is distinct and separate, and it does not concern one of the complainants whether another pays or not. All the joint interest the parties have is a joint interest in a question of

law; just such an interest as might exist in any case where separate demands are made of several persons. Such a common interest there might be if several persons should give several promissory notes on distinct purchases of a worthless article; and such there might have been under the former prohibitory liquor law had demands been made against several persons for liquors illegally sold to them. We venture to say that it would not be seriously suggested that a common interest in any such question of law, where the legal interests of the parties were wholly distinct, could constitute any ground of equitable jurisdiction when the several controversies affected by the question were purely legal controversies. Suits do not become of equitable cognizance because of their number merely. This was affirmed in *Lapeer County v. Hart, Har. Ch., 157*, and in the two cases of *Sheldon v. School-District, 25 Conn., 224*, and *Dodd v. Hartford, Ibid., 232*, which in their facts, so far as this question is concerned, were like the present case, with a single exception which is not to the advantage of these complainants. In those cases the single assessment of a school-tax was involved, and the parties concerned, if permitted to unite, might have had the whole controversy determined in the one suit. In this case the controversy is either separate, as the tax is several against each individual, or it is general, as it affects all the persons taxed under the law. Considered as a controversy which affects all the persons taxed, this suit would wholly fail in the purpose of preventing a multiplicity of suits, because the court in which it was brought has only a local and limited jurisdiction. Other suits might be brought outside of Detroit, and in every county of the state; and at best this suit would only reduce the number of suits, while it could not prevent a multiplicity of them. On this general subject we content ourselves with referring further to *Jones v. Garcia, 1 Turn. & Russ., 297; Yeaton v. Lenox, 8 Pet., 123; Adams Eq., 198–202.*

Other considerations on this branch of the case we ab-

stain from presenting, because an argument has been withheld; and under such circumstances we deem it advisable to present none but those which are not only conclusive, but are unquestionable. We present these for the purpose of showing that if the merits of this controversy were with the complainants, the bill would nevertheless be dismissed, because the parties have no standing in a court of equity. They cannot make remedies for themselves which the law has not given them. We do not know whether there was any express assent on the part of the defendant to this jurisdiction. If there was, it could be of no avail, for reasons already stated. He would be powerless in any case, but specially so in a case like the present, where he is acting in a public capacity; and the consent, if given, would not be on his own behalf, but on behalf of the public, whom for any such purpose he has no authority to represent.

The question then arises whether, the case being one of which the court below had no jurisdiction, this court on appeal shall proceed to express an opinion upon the merits. The considerations which bear upon that question are conflicting. As a general rule an opinion on the merits of a controversy ought to be declined when the court is powerless to give the relief demanded. But this case is in many particulars exceptional. It has been argued on the merits, the state intervening for the purpose; and there is no reason for any suggestion or suspicion that in this court, at least, it is not a *bona fide* controversy. The legal points involved in the merits have been presented in good faith, and we have no reason to suppose that, should the controversy be presented again in a more regular form, the case would assume any different phase on the argument. There is, besides, abundant reason apparent on this record for believing that the public interest demands an early determination of the questions involved. The pendency of this suit has to some extent delayed for a considerable period the enforcement of a state law which is supposed to be of high importance; and if this should go off on the jurisdictional question, there

is reason to look for further litigation which would consti-
tute a ground, or at least a pretense for further delay.
Under all the circumstances, we are agreed that an exam-
ination of the case on the merits, and an opinion thereon,
are not only justifiable, but are demanded by considerations
of public importance.

The question which lies at the foundation of the litiga-
tion relates to the validity of the act for the taxation of
the liquor traffic, passed May 3, 1875.—*General Laws of
1875, page 274.* The complainants, it appears, have
severally been assessed a tax as dealers in liquors, and they
contest the payment on the ground that the legislature had
no constitutional authority to impose it. A number of
reasons are assigned for the invalidity of the tax, and these
we shall consider separately.

1. It is objected that the tax is a state specific tax, and
that the law imposing it is unconstitutional, because it devotes
the money raised to the use of the towns, villages and cities
in which the business taxed is carried on, in violation of
*Article I, Section 14 of the Constitution,* which provides
that " all specific state taxes, except those received from the
mining companies of the Upper Peninsula, shall be applied
in paying the interest upon the primary-school, university
and other educational funds, and the interest and principal
of the state debt, in the order herein recited, until the
extinguishment of the state debt, other than the amounts
due the educational funds, when such specific taxes shall be
added to and constitute a part of the primary-school interest
fund." The only question that arises upon this objection
is whether this tax is a state tax or not. It was settled in
*Walcott v. People, 17 Mich., 68,* that the state might pass
laws for the levy of new specific taxes, and in *Kitson v.
Ann Arbor, 26 Mich., 325,* that local specific taxes might
be authorized. The substantial difference between this
case and the one last cited consists in the fact that there
the tax was levied under a city ordinance and here it is
levied by general law. In both cases the money was to be

put to local purposes. In one sense, undoubtedly, any tax levied by a general law is a state tax; but if the moneys are to be put to local uses, the only substantial difference between that and one levied by local action, consists in this: that in one case the state levies the tax, and in the other it authorizes the levy. All taxation must be authorized by the state, and we know of no reason why all taxation for the ordinary purposes of government may not be levied under general laws when no express provision of the constitution forbids it. Such legislation is no novelty in this state or elsewhere. Highway and school taxes are very commonly levied in that way; the local authorities, as to some of them, having no option, but being put under legal compulsion to assess and collect them. The school mill tax may be taken as an illustration. Collected under a general law, it was nevertheless put to the uses of the community which paid it; and it was in no proper sense any thing more than a local tax. Neither is the tax now in question.

2. It is said the tax is invalid because it is not levied on any principle of equality or uniformity, and consequently lacks one of the essential elements of lawful taxation. If the precise point here is that the tax is unequal and unjust because it is not levied in proportion to the business done, then the objection is without force. It may possibly be true that an apportionment according to the business done would have been more just; but a question of this nature concerns the legislature, and not us. Courts cannot annul tax laws because of their operating unequally and unjustly. If they could they might defeat all taxation whatsoever; for there never yet was a tax law that was not more or less unequal and unjust in its practical workings.—*Kirby v. Shaw, 19 Penn. St., 258; Commonwealth v. Savings Bank, 5 Allen, 428; Allen v. Drew, 44 Vt., 174; Grim v. School District, 57 Penn. St., 433; People v. Worthington, 21 Ill., 171; Coburn v. Richardson, 16 Mass., 213, 215; Coite v. Society for Savings, 32 Conn., 173, 184.* But the objection to a want of uniformity is wholly misplaced here.

Uniformity is the very basis of this tax.  It is levied entirely
without discrimination; and the real objection made to it is, not
that it lacks uniformity, but that the legislature were unjust
in making it uniform, instead of levying it by some standard
of discrimination.      The objection presents a case of misap-
plication of terms.      It is also presented to the wrong
tribunal.      The question whether a tax is just and equal or
not is not a question of law.      And this will meet any
objection to the law based upon the fact that other kinds
of business are not similarly taxed.      Apportionment of tax-
ation is purely a legislative function.

3.  It is urged that the tax is void as a local tax because
the municipalities have no voice in its levy and collection.
In support of this objection decisions are cited in which this
court affirmed the right of the municipalities to choose their
own local officers, and to decide for themselves whether they
would burden their property with taxes for mere local con-
veniences in which the people of the state at large had no
interest.      Those decisions were made in cases in which the
municipality was objecting to unusual legislation which pro-
posed to subject it to extraordinary burdens.   There is
nothing of the like nature here.      The municipality is not
complaining, and the legislation proposes to make its bur-
dens lighter, instead of heavier.      The complaint, if any local
rights are invaded, comes from the wrong source.      The city
ought to be here showing cause why she should be compelled
to receive the tax, instead of these complainants showing cause
why they should not pay it over to the city.      When the
city of Detroit shall object to having the money thrust upon
her, it will be time enough to inquire whether any of her priv-
ileges are taken away by the law; at present it is sufficient
to say, that parties whose interests are directly antagonistic
to those of the city in regard to the particular matter
in controversy are not to be heard objecting on her behalf
that the rights of the city are violated by the collection of
a tax for her use.      But it cannot escape even the most
casual observation, that the purpose of this legislation, so

far as it involves local rights, is directly the opposite to that which was held inadmissible in *People v. Hurlbut, 24 Mich., 44*, and *Park Commissioners v. Common Council of Detroit, 28 Mich., 228*. The legislation which came under consideration in those cases was designed to eventuate in taxation of the people of Detroit against their opposition; this only provides for a general tax, which, so far as it is collected within any particular locality, is handed over to the local authorities and credited to the local contingent fund. As a part of that fund it will be put to such purposes as the local authorities may agree upon, and presumptively these will be the general purposes of local government. The law therefore favors the localities, instead of forcing unusual burdens upon them.

4. It is objected that the sheriff is made the collector of township, village and city taxes under this law, when by right that duty, and the fees which are given for its performance, belong to the township, village or city collector, or treasurer. This objection, like the last, comes from the wrong source. Those on whose behalf it is made are not here as parties, and we are not aware that they complain. The parties taxed are the persons who manifest this decided interest in the constitutional emoluments of the office of collector, and not those who are said to be entitled to the fees. If the objection were a valid one, it is not clear that it could invalidate the tax; it might only raise the question of the right of a particular officer to collect it. It is certain that it could constitute no objection to the tax in equity; for as between the town or city and the party taxed, the equity of the tax is not in the least affected by the circumstance that the wrong officer is deputed to collect it, if that constitutes the only valid objection. But we think the objection is without force, either at law or in equity. Admitting what these complainants insist upon, that the township and city collectors have a constitutional right to perform all the duties that belonged to their offices when the constitution was adopted, it does not follow that they are entitled to collect

this tax. A constitutional right to perform the old duties cannot be extended to cover new duties merely because they happen to be of a similar nature. This law takes from the local officers nothing; the complaint of it is that in providing for a new duty it confers it upon another officer instead of upon the township and city officers. In this there is nothing unusual. Sheriffs in many states are collectors of taxes, and in this state they have always in some contingencies been collectors. It is true that in collecting this tax the sheriff acts on behalf of the municipalities; but so he does in any case where the tax warrant is delivered to him; and so do the county treasurer and auditor general in collecting taxes, for they collect the local taxes as well as those levied for state purposes. The whole tax system is something in which the state at large is concerned, and the rules by which it may be made to operate harmoniously cannot be rules so inflexible as not to yield to circumstances, when the legislature deems it essential.

But there is another consideration that is conclusive on this point. This objection, like the last, is supposed to find support in the reasoning of this court in *People v. Hurlbut, 24 Mich., 44.* But in that case we took especial pains to show that for some purposes the townships, villages and cities of the state could not be permitted to act independently, but were and must be subject to compulsion by the state. The case of taxes for general purposes was specially instanced, and it was said the municipalities could not be left to collect these or to refuse to collect them at their own volition; they must collect them, and they must sustain local government, whether willing to do so or not. To that extent every part of the state was concerned in the action of every other part, because disorder in one locality would derange more or less the whole system. In the previous case of *People v. Mahaney, 13 Mich., 487,* it had been decided that the state had power to take control of the police of the city; and this was cited with approval in *People v. Hurlbut,* on the express ground that the police of the state and the preser-

vation of order in every locality was matter of state concern, and not of mere local interest. It requires no argument to demonstrate this; the effect upon the whole state of abrogating local government in a single city or township, and leaving everything to disorder and to the unrestrained passions of bad men, would inevitably be pernicious beyond estimate.

Now the law under consideration, though having revenue for one object, has the police of the state for another. It was deemed important to adopt it as a matter of police regulation. The legislature saw fit not to leave it to the localities to enforce it or not at their option, and it is matter of reasonable inference that they refrain from doing so because the refusal of a locality to enforce it would introduce disorder into the system. Whether that was the reason or not, they had, as we think, an unquestionable right to make all such provisions as they deemed essential to preclude the probability of the law being nullified in any quarter. If to accomplish this it was deemed essential to commit the execution of the law to county instead of municipal officers, we know of nothing to preclude it. There is certainly nothing in the previous decisions of this court that is inconsistent with this feature of the law.

5. The objection which appears to be principally relied upon is, that a tax on the traffic in liquors under this law is equivalent to a license of the traffic, and therefore comes directly in conflict with that provision of the constitution which declares that "the legislature shall not pass any act authorizing the grant of license for the sale of ardent spirits or other intoxicating liquors."—Const., Art. IV., Sec. 47. In order to arrive at the exact meaning of this provision, and to show what the convention and the people had in view, and intended to accomplish in adopting it, no little industry has been expended in sifting the proceedings of the convention, and in bringing before us the expression of views by the different members of that body upon the subject of the liquor traffic. But one needs to give very little attention to

the proceedings, in order to be convinced,—what in fact is a part of the public history of the time,—that members of the convention who expressed views leading to the same result in shaping the instrument to be submitted to the people, had objects in view which were totally different, and expected, or at least hoped, to accomplish wholly different ends by means of the provision finally agreed upon.   The provision itself was experimental, and no one could safely predict the consequences; but while those who favored the total destruction of the traffic in ardent spirits hoped to accomplish that object by means of a prohibition of license, others, not wiling to destroy the trade, regarded the inhibition of license as a removal of embarrassing restrictions and impediments. The provision agreed upon was not of itself a prohibition of the traffic, and upon this the most diverse views might be concentrated; but beyond this there was no harmony of purpose whatsoever.   With license prohibited a broad field was still left for legislation, and each side might hope to obtain the advantage in that, and not to find the constitutional provision interpose any serious obstacle.   For these reasons the proceedings of the constitutional convention are as nearly as possible worthless for any purpose of giving aid in the construction of this provision; and we can only take it as it stands, and seek the meaning in the words employed to express it.

Does, then, a tax upon the traffic in liquors come within the condemnation of this provision of the constitution, as being equivalent to a license of the traffic?   Is it the same in legal effect, or is it the same according to the popular understanding of the term license?   This is the question that presents itself for decision on this branch of the case.

The popular understanding of the word license undoubtedly is, a permission to do something which without the license would not be allowable.   This we are to suppose was the sense in which it was made use of in the constitution.   But this is also the legal meaning.   "The object of a license," says *Mr. Justice Manning,* "is to confer a right

that does not exist without a license."—*Chilvers v. People,
11 Mich., 43, 49.* Within this definition, a mere tax upon
the traffic cannot be a license of the traffic, unless the tax
confers some right to carry on the traffic which otherwise
would not have existed. We do not understand that such
is the case here. The very act which imposed this tax
repealed the previous law, which forbade the traffic and
declared it illegal. The trade then became lawful, whether
taxed or not; and this law, in imposing the tax, did not
declare the trade illegal in case the tax was not paid. So
far as we can perceive, a failure to pay the tax no more
renders the trade illegal than would a like failure of a
farmer to pay the tax on his farm render its cultivation
illegal. The state has imposed the tax in each case, and
made such provision as has been deemed needful to insure
its payment; but it has not seen fit to make the failure to
pay a forfeiture of the right to pursue the calling. If the
tax is paid, the traffic is lawful; but if not paid, the traffic
is equally lawful. There is consequently nothing in the
case that appears to be in the nature of a license. The
state has provided for the taxation of a business which was
found in existence, and the carrying on of which it no
longer prohibits; and that is all.

But it is urged that by taxing the business the state rec-
ognizes its lawful character, sanctions its existence, and
participates in its profits,—all of which is within the real
intent of the prohibition of license. The lawfulness of the
business, if by that we understand merely that it is no longer
punishable, and is capable of constituting the basis of con-
tracts, was undoubtedly recognized when the prohibitory law
was repealed; but as the illegality of the traffic depended on
that law, so its lawfulness now depends upon its repeal;
the tax has nothing to do with it whatever. Now it is not
claimed, so far as we are aware, that the repeal of the pro-
hibitory law was incompetent; and if not, the mere recognition
of the lawfulness of the traffic cannot make the tax law or
any other law invalid. It is only the recognition of an

existing and a conceded fact, and the courts cannot, if they would, refuse to recognize it.

The idea that the state lends it countenance to any particular traffic by taxing it, seems to us to rest upon a very transparent fallacy. It certainly overlooks or disregards some ideas that must always underlie taxation. Taxes are not favors; they are burdens; they are necessary, it is true, to the existence of government, but they are not the less burdens, and are only submitted to because of the necessity. It is deemed advisable to make careful provision to preclude these burdens becoming needlessly oppressive; but it is conceded by all the authorities, that under some circumstances they may be carried to an extent that will be ruinous to individuals. It would be a remarkable proposition, under such circumstances, that a thing is sanctioned and countenanced by the government when this burden, which may prove disastrous, is imposed upon it, while, on the other hand, it is frowned upon and condemned when the burden is withheld. It is safe to predict that if such were the legal doctrine any citizen would prefer to be visited with the untaxed frowns of government rather than with those testimonials of approval which are represented by the demands of the tax-gatherer.

It may be supposed that some idea of special protection is involved when a business is taxed; taxation and protection being reciprocal. If the tax upon any particular thing was the consideration for the protection given to the owner in respect to it, this might be so; but the maxim of reciprocity in taxation has no such meaning. No government ever undertakes to tax all it protects. If a government were to levy only poll taxes, it would not be on the idea that it was to protect only the persons of its citizens, leaving their property open to rapine and plunder. In this state our taxes are derived mainly from real estate; but it has never been suggested that real estate was entitled to special considerations in consequence. In Great Britain real estate pays a relatively insignificant portion of the taxes, although in

the social and political state it is more important than all other property.  As a general fact the United States has not taxed real property; and though during the recent rebellion it taxed most kinds of business for war purposes, the number of subjects taxed has been several times reduced by legislation since, and may reasonably be expected to be further reduced hereafter.  But the business taxed is no more protected than the business not taxed; and the fisheries, which are favored by bounties, are as much protected as either.  All this is only an apportionment of taxation by the selection of subjects which under all the circumstances it is deemed wise and politic to subject to the burden.   Whether a person in respect to his property or his occupation falls within the category of taxables or not is immaterial as affecting his claim to protection from the government.   It is enough for him that the government has selected for itself its own subjects for taxation, and prescribed its own rules.   It is his liability to taxation at the will of the government that entitles him to protection, and not the circumstance of his being actually taxed.   And the taxation of a thing may be, and often is when police purposes are had in view, a means of expressing disapproval instead of approbation of what is taxed.

There has undoubtedly been felt and expressed a strong sentimental objection to the doing of any thing by the state that even seemed to be a lending of its countenance to a business which the objectors regarded as an evil in itself; especially to the state participating in the profits of a pernicious trade.   But the objection never found expression in laws forbidding the taxation of liquors or of the business of dealing in them.   Indeed, in this state liquors have always been taxable as property; and so have been the implements by means of which forbidden games of chance have been carried on.   Yet when the keeper of billiard tables is compelled to pay a tax, it can be no defense to him, either in law or in morals, that he is compelled to do so from the profits of an illegal business.   To refuse to receive the tax

under such circumstances would tend to encourage the business, instead of restraining it; and would not only be un wise because of exempting one man from his fair share of taxation, but also because it would tend to defeat the state policy which forbids games of chance and hazard. The idea that a thing is favored because it is taxed may be examined in the light of the practice of this state in some other particulars. It has always been the custom in apportioning taxes by valuation to make some discrimination based on reasons of public policy. As an illustration we may mention the case of property devoted to educational or charitable purposes, and which as a rule has been exempted from general taxation. The general belief has been, that the interests and welfare of the whole community would be best subserved by abstaining from any imposition of the burdens of government upon such property; and the legislature in apportioning the taxes has accepted this general belief and acted upon it. It has been done as a matter of favor and by way of encouragement; and yet if the argument against the tax in this case is sound, we do not see why the state should not have evidenced its approbation of educational and charitable institutions by taking special care that they should feel its burdens, while at the same time it stigmatized other things which were regarded as immoral or pernicious, by refusing to permit them to appear on the tax roll. A tax roll might, undoubtedly, be made in this manner a roll of reputable names, or even a roll of honor, but how any sound public policy would be subserved by it must require considerable ingenuity to point out. It would assuredly not be such policy as states have usually acted upon. While in the selection of objects for taxation, revenue is to be considered and kept in view, it is impossible to exclude other considerations. In proposing a tax it might always be a question whether it should be imposed upon persons, or upon property by value, and if so, upon what property, or upon business; and if so, what kind of business, or whether it should not be a combination of all these. One method might be the

easiest for the collection of the necessary revenue, but most injurious or unequal in its results; one might discourage industry and another encourage it; one might collect the tax from luxuries, and therefore fall mainly upon the rich, while another would collect it from necessaries and be oppressive to the poor. The whole question would be quite as much one of policy as of necessity, and a legislator would be unfit for his office who did not look beyond the proposed tax to its probable results. This is especially true in every case where the tax has reference to police as well as revenue. A particular business may then be taxed while others are spared, not only because for any reason it can best bear the burden, but also because such surroundings attach themselves to the business taxed as to render the discouragement and discipline of heavy taxation wise and politic. In the few cases in which the right to do this has been denied on the ground of inequality, the courts have affirmed it as being beyond question.—See *Durach's appeal, 62 Penn. St., 491, 494; Fletcher v. Oliver, 25 Ark., 289; State v. Parker, 32 N. J., 426, 431.* The federal government has gone to a great extent in the same direction, levying duties in some cases which in their results are prohibitory; and in the case of the state banks purposely taxing them out of existence.— *Veazie Bank v. Fenno, 8 Wall., 533.* This case does not call for any expression of opinion upon legislation of that extreme character, for we have nothing in this law that goes beyond the ordinary legislation when it is enacted for the double purpose of revenue and regulation.

This state has never shown any disinclination to make things morally and legally wrong contribute to the public revenue when justice and good morals seemed to require it. If it were to act upon the idea of refusing to derive a revenue from such sources, it ought to decline to receive fines for criminal offenses with the same emphasis that it would refuse to collect a tax from an obnoxious business. If the tax is laid by way of discouragement or regulation, it has the same general object in view with the fine; not only as it affects

the person taxed and the community, but also in the use to which the money is devoted. Yet the constitution expressly provides for a library fund to be derived from the violations of the public law (*Constitution, Art. XIII., Sec. 12*), a provision that may as legitimately be said to be a license of crime, as a tax on a traffic may be said to be a license of the traffic.

Taxes upon business are usually collected in the form of license fees; and this may possibly have lead to the idea that seems to have prevailed in some quarters, that a tax implied a license. But there is no necessary connection whatever between them. A business may be licensed and yet not taxed, or it may be taxed and yet not licensed. And so far is the tax from being necessarily a license, that provision is frequently made by law for the taxation of a business that is carried on under a license existing independent of the tax.

Such is the case where cities, under proper legislative authority, tax occupations which are carried on under licenses from the state.—*Ould v. Richmond, 23 Grat., 464; Napier v. Hodges, 31 Texas, 287; Cuthbert v. Conly, 32 Geo., 211; Wendover v. Lexington, 15 B. Monr., 258;* see also *Home Ins. Co. v. Augusta, 50 Geo., 530.* The license confers a privilege, but it is not perceived why a privilege thus conferred should not be taxed as much as any other. The federal laws give us illustration of the taxation of illegal traffic. A case in point was that of the taxation of the liquor traffic in this state previous to the repeal of the prohibitory law; the federal law found a business in existence and it taxed it without undertaking to give it any protection whatever.—*McGuire v. Com., 3 Wall., 387; Pervear v. Com., 5 Wall., 475.* What would have prevented the state from taxing the same traffic at the same time? Is it any more restricted in the selection of subjects of taxation than the general government is? If one may tax and at the same time refuse to protect may not the other do the same? The only reason suggested for a negative

32 MICH.—54.

reply to these questions is, that it was the state itself, not the United States, that made the business illegal, and it would be inconsistent and absurd to declare it illegal and at the same time tax it.   But how the inconsistency would appear in one case rather than the other is not apparent. The illegality was declared by competent authority, and yet the federal government taxed the trade, at the same time refusing, or being unable to protect it.   If protection because of the tax was due to the very thing upon which the tax was imposed, there would be an inconsistency in taxing a prohibited trade; but treating taxation, however and wherever it may fall, as the return for the general benefits of government,—for the protection of life, liberty, the social and family relations, as well as to business and property,— which is the only legal and proper idea of taxation, there is no inconsistency whatever in making a thing which is not protected one of the measures or standards by which to determine how much the party owning or supporting it ought to pay to the government.   If one puts the government to special inconvenience and cost by keeping up a prohibited traffic or maintaining a nuisance, the fact is a reason for discriminating in taxation against him; and if the tax is imposed on the thing which is prohibited, or which constitutes the nuisance, the tax law, instead of being inconsistent with the law declaring the illegality, is in entire harmony with its general purpose and may sometimes be even more effectual.   Certainly, whatever discriminations are made in taxation ought to be in the direction of making the heaviest burdens fall upon those things which are obnoxious to the public interests, wherever that is practicable.

For these reasons we think the objections which have been make to the law have no validity.

The decree of the superior court dismissing the bill will be affirmed, with costs.

The other Justices concurred.