## PALMER & CARTWRIGHT *v.* STATE.

## (*Nashville.* February 22, 1890.)

1. GAMING. *Selling pools upon horse-races.*

   Selling "auction pools" upon horse-races to be run upon an *unlicensea* track within the State, or upon any track outside the State, is gaming within the prohibition of the statute making it a misdemeanor to "make any bet or wager for money or any other valuable thing."

   Code construed: §§ 5688, 5701 (M. & V.); §§ 4870, 4881 (T. & S.).

   Cases cited and approved: Edwards *v.* State, 8 Lea, 412; Daly *v.* State, 13 Lea, 228; Blackburn *v.* State, 2 Cold., 235.

   *Question reserved:* Is selling "auction pools" upon horse-races a lottery, and therefore incapable of being legalized as to races run upon licensed tracks within the State under Art. XI., Sec. 5, of Constitution?

2. SAME. *Case of "auction pools."*

   The facts stated in the opinion constitute a case of selling "auction pools."

3. SAME. *Construction of statute making "pool-selling" a privilege.*

   A general provision in an assessment Act, declaring "pool-selling" a privilege for the purpose of taxation, must be restricted in its application to the selling of pools upon horse-races run upon licensed tracks within the State; and will not include "pool-selling" upon illegal races.

   Acts construed: Acts 1887, Ch. 130, p. 43; Acts 1889, Ch. 96, p. 168.

4. SAME. *Construction of revenue Act of 1889 levying tax upon "pool-selling."*

   The revenue Act of 1889 imposed a tax "upon each person, company, firm, or corporation, or agent engaged in selling pools upon any running, trotting, or pacing race *in this or any other State.*" By the assessment Acts "pool-selling" had been declared a privilege in general terms.

Palmer & Cartwright *v.* State.

*Held:* That the revenue Act of 1889 had not the effect to enlarge the privilege created by the assessment Acts, or to render legal the selling of pools upon races run outside the State, or upon unlicensed tracks within the State.

Act construed: Act 1889, Ch. 130, p. 260.

Cases cited and approved: 32 Mich., 406; 5 Wall., 462.

Cited and distinguished: Dun *v.* Cullen, 13 Lea, 202; State *v.* Duncan, 16 Lea, 81.

---

FROM DAVIDSON.

---

Appeal in error from Criminal Court of Davidson County.   G. S. RIDLEY, J.

HILL & GRANBERY and QUARLES & TURLEY for Palmer & Cartwright.

Attorney-general PICKLE, E. E. BARTHEL, and E. H. EAST for State.

LURTON, J.   Appellants have been convicted of gambling.   The indictment charged that they had bet, gambled, and put to hazard upon a horse-race run upon a track not authorized by this State; and in a second count, that they had encouraged and promoted gambling upon races upon tracks not licensed by this State.

The case was tried without a jury upon an agreement as to the facts.   This agreed state of facts is as follows:

Palmer & Cartwright *v.* State.

*First.*—That the defendant did, on May 15, 1889, and before the presentment in this case was found, and within the city of Nashville, Davidson County, State of Tennessee, and within the jurisdiction of this Court, both sell and offer to sell wagers or bets upon horse-races to be run both in and out of the State of Tennessee, upon a race-track other than a lawfully chartered or incorporated blood-horse or turf association, or trotting association, or stock or agricultural fair association.

*Second.*—In this case there were four horses to be run in the race. The defendant offered to sell at public outcry the first choice for the winner in said race, when $50 was bid therefor by a by-stander, which being the highest bid was accepted, and the money paid over to the defendant; and thereupon the defendant offered the second choice on the horses to be run in said race, whereupon a by-stander bid $40, which bid being the highest was accepted, and money paid over as before; and thereupon the defendant offered for sale in the same manner the third choice of the horses to be run in said race, whereupon a by-stander bid $30, which being the highest bid was also accepted; and thereupon the defendant offered the remaining, an unsold horse, in the same manner, whereupon a by-stander bid $20, which being the highest bid was also accepted.

These several sums made altogether the gross sum of $140, from which gross sum the defendant deducted five per cent., or $7, as his commission

for his services, leaving remaining net $133. On the succeeding day the horse-race was run, and the party who had purchased, in the manner hereinbefore stated, the horse that won or came out ahead in the race was entitled to and did receive from the defendant the whole sum of $133, which .was accordingly paid over to said party. The defendant kept books or memorandums of each bid made and accepted as hereinbefore stated. These transactions hereinbefore related all occurred in a room called a pool-room, or place for selling pools on horse-races. This particular race was run upon a track outside of the State of Tennessee, but in the State of Kentucky, and within the six months next preceding the finding of the presentment in this case. This is known as auction pools.

*Third.*—It is further agreed and admitted that the defendant, at the time of the selling of said pools as stated in paragraph two, had duly paid to the County Court Clerk of Davidson County the privilege tax of $500 imposed upon pool-selling by an Act of the General Assembly of the State of Tennessee entitled "An Act to provide revenue for the State of Tennessee. and the counties thereof," approved April 8, 1889; and that the said Clerk of the County Court of Davidson County had, in consideration of the payment of said privilege tax, duly issued and delivered to the defendant a license as provided in said Act of the General Assembly for pool-selling, and that said license was in full force and effect prior to May

15, 1889, and on said day and continuously until this date.

The question for decision is as to the effect of the alleged license in legalizing the sale of pools upon races run outside of the State, or upon tracks not licensed by this State and within the State.

By § 4870 of the Code of Tennessee it is made a misdemeanor to "make any bet or wager for money or any other valuable thing." By § 4881 horse-racing "upon a track or path kept for that purpose" is exempted from the provisions of the statutes against gaming. The . betting of money upon a horse-race upon a track within the State not licensed by the State has been held to be gambling within § 4870. *Huff* v. *State*, 2 Swan, 279.

The Act legalizing racing upon licensed tracks has been held to have been intended to encourage the improvement of domestic stock, and not intended to make gaming lawful upon races run outside of the State, and that betting upon races run in another State was a misdemeanor under § 4870. *Edwards* v. *State*, 8 Lea, 412; *Daly* v. *State*, 13 Lea, 228; *Blackburn* v. *State*, 2 Cold., 235.

By the revenue Act of 1885 a tax of $300 was put upon the occupation of "pool-selling." Acts of Extra Session 1885, p. 43.

By the assessment Act of 1887 the occupation of "pool-selling" was declared to be a privilege, and not to be pursued without license. Acts of 1887, p. 43. By the revenue Act of the same

year a tax was placed upon this business. Acts of 1887, p. 17.

By the assessment Act of 1889, Section 52, the avocation of "pool-selling" is again declared a privilege, and, as such, not to be pursued without license. Acts of 1889, p. 168. By the revenue Act of same year a tax is placed "upon each person, company, firm, or corporation, or agent engaged in selling pools upon any running, trotting, or pacing race *in this or any other State.*" Acts of 1889, p. 260.

If the selling of pools be not a lottery—a question not here decided, for reasons hereafter noticed—then the sale of pools upon races to be run upon a track licensed by this State would not be gaming within our statutes. *Daly* v. *State,* 13 Lea, 228.

It was, however, within the power of the Legislature to make the business of selling pools a privilege, and to assess upon the privilege such tax as was deemed wise. Both of the Acts erecting "pool-selling" into a privilege—that of 1887 and that of 1889—designate the business as "pool-selling," without further words describing the limits of the business.

To make this business, by its general designation, a privilege would no more authorize a seller to sell pools upon an unlawful race than does the liquor-dealer's license authorize him to sell liquors to minors, or upon Sunday, or within four miles of a school-house. The privilege of "pool-selling,"

which is not to be pursued without a license, is
limited to the sale of lawful pools—that is, pools
which are, in substance, bets upon races to be
run upon a licensed track or turf within this
State. The tax assessed upon the privilege by the
Acts of 1885 and 1887 was assessed upon "pool-
selling," no effort being made to designate whether
upon races in or out of the State. The change
made in the assessment of the tax upon this oc-
cupation by the Act of 1889, is made by adding
the words *"in this or any other State."* The con-
tention is that the addition of these words, not
in the Act creating the privilege but in Act simply
fixing the tax upon a privilege created by another
and different Act, operates to *license* the sale of
pools upon races run upon unlicensed tracks in
this State and upon all tracks in other States,
and that the licensing of an act theretofore crim-
inal operates to make the act legal, and entitles it
to the protection of the law. To put this con-
struction upon this clause in a revenue Act, would
operate to repeal in part the criminal law of the
State, and to render lawful a species of gambling
which has been heretofore unlawful. Was it the
intent of the Legislature, by the words added to
the language theretofore used in fixing the amount
of tax upon the occupation of pool-selling, to en-
large the privilege of selling pools beyond such
pools as were sold upon lawful races? Or was it
the intent of the law-makers, by the levying
of this tax, to create the privilege of selling

pools upon races to be run outside the State? If
the Act which enumerated and created privileged
occupations had, in express words, authorized the
licensing of the business of selling pools upon
races run in other States, we should then have had
a very different question to deal with; for, in that
case, there would be no doubt that the intent of
the Legislature was to make that species of busi-
ness a privilege. The effect of such legislation in
an assessment Act, in repealing the statute mak-
ing such pool-selling criminal, would present a
very grave question. But the question we have
to deal with here is as to whether the Legislature
intended by the words they have used in describ-
ing this business to authorize or license the sale
of pools upon illegal races.

The case of *Dun* v. *Cullen*, 13 Lea, 202, is
cited by the learned counsel as settling this ques-
tion of legislative intent. That case was this:
The business of commercial agencies was not made
a privilege in the Act creating and enumerating
privileged avocations. In the revenue bill a tax
was levied upon the occupation. The Court were
agreed that the language of the revenue Act—
namely: "That the rate of taxation on the fol-
lowing privileges shall be as follows," naming the
avocations and the rate of tax—would ordinarily
be sufficient to create a privilege, and forbid its
exercise without license. "The difficulty," said
Judge Cooper, speaking for the Court, "grows out
of the fact that the Legislature has passed two

Acts—one of them apparently intended, among other things, to designate the taxable privileges, and the other to fix the rate of taxation upon privileges; and the doubt is, whether the latter Act was actually intended to create a privilege." "The point," said he, "is one of some nicety." He reaches a conclusion of this question by the suggestion that this business of a commercial agency was "mentioned unquestionably with the expectation that [it] was to be taxed, and if the Legislature has used language sufficient to enable us to carry that intent into effect it would seem to be our duty to effectuate the intent. We think this the better conclusion, and hold the occupation taxable." 13 Lea, 205.

The sole inquiry in that case was as to whether the intent of the Legislature was to make that occupation taxable, and the duty of the Court was to carry out that intent, if made sufficiently plain. Here the question of "nicety" is not as to whether the Legislature intended to create poolselling a privilege. That they have done in express words. But did they intend by the words used in describing a privilege created by another Act, to enlarge it so as to make legal that which by the general law was criminal, or to create a new and different privilege from the one created by the Act enumerating taxable privileges? This case is distinguishable from that in many obvious particulars.

Neither is the case of the *State* v. *Duncan*, re-

36—4 P

ported in 16 Lea, at page 81, a controlling case. By an Act approved March 30, 1883, it was made a misdemeanor to buy or sell futures. By the assessment Act, approved on the same day, the business of selling futures was made a privilege, and a tax assessed by the revenue Act thereon. The two Acts thus passed together were, for this reason, construed together for the purpose of arriving at the meaning and intent of each. "The effect of the Acts of 1883, taken together," said Judge Cooper, "is to make it a misdemeanor both in the buyer and seller to deal in futures without a license, and at the same time legalize the dealing by the taking out of a license." 16 Lea, 81.

We have no such case here. By very ancient statute law betting upon races other than such as were run on licensed tracks, was a misdemeanor. This exception in favor of domestic races was, in its evil results, comparatively limited. To extend this exemption to races run everywhere is, as we can very well know from our knowledge of affairs, to open the doors of gambling establishments all the year round. Did the Legislature intend by the revenue Act of 1889 to repeal the general and ancient law of the State, which made such betting criminal? It is not the case of two Acts upon the same subject, passed upon the same day, and the rule of construction applicable in the Duncan case has no application here.

The tax upon the business of selling pools upon races to be run on licensed tracks within this

State is a tax upon a lawful business, if it be not a lottery, a question which we do not decide, for the reason that a majority of the Court are of opinion that for the reasons stated the provision concerning sales of pools on races run outside the State is ineffectual, whether it did or not attempt to license a lottery, as it did not in fact license pool-selling on races outside the State. But so far as it seems to be a tax upon the selling of pools upon races not so run, it is at most a tax assessed upon an unlawful occupation. Taxation so imposed will not be construed to operate as a license legalizing such unlawful betting. Taxation, even under the form of a privilege tax, does not necessarily operate to license the business. The Constitution of Michigan prohibited the passing of any law licensing liquor-dealing. A specific tax was assessed upon liquor-dealers. It was held by the Supreme Court of that State, Judge Cooley delivering the opinion, not to be in its legal effect a license tax, or in any way to sanction, authorize, or countenance the business.

"The idea," said Judge Cooley, "that the State lends countenance to any particular business by taxing it, seems to us to rest upon a very transparent basis. It certainly overlooks, or disregards, some ideas that must underlie taxation. Taxes are not favors, but burdens; they are necessary, it is true, to the existence of government, but they are not the less burdens. *   *   *   It would be a remarkable proposition under such circum-

stances, that a thing is sanctioned and countenanced when this burden, which may prove disastrous, is imposed upon it, while on the other hand it is frowned upon and condemned when the burden is withheld. * * * The taxation of a thing may be, and often is, when police purposes are had in view, a means of expressing disapproval instead of approbation. * * * A business may be licensed and not taxed, and it may be taxed and yet not licensed. And so far is the tax from being necessarily a license, that provision is frequently made by law for the taxation of a business that is carried on under a license existing independently of the tax." He concludes a most elaborate discussion by saying: "If one puts the government to special inconvenience and cost by keeping up a prohibited business, or maintaining a nuisance, the fact is a reason for discriminating in taxation against him. And if the tax be imposed on the thing which is prohibited, or which constitutes the nuisance, the tax law, instead of being inconsistent with the law declaring the illegality, is in entire harmony with its general purpose, and may sometimes be even more effectual. Certainly whatever discriminations are made in taxation ought to be in the direction of making the heaviest burdens fall upon those things which are obnoxious to the public interests whenever that is practicable." *Youngblood* v. *Sexton*, 32 Mich., 406.

An instance of a license in terms which does not carry with it protection, is that of the Fed-

eral tax upon the occupation of liquor-dealing in States or localities where such traffic is illegal. License Tax Cases, 5 Wall., 462.

Concerning this class of cases it is said: "These burdens are imposed in the form of what are called license fees; and it has been claimed that when the party paid the fee he was thereby licensed to carry on the business, despite the regulations which the State government might make upon the subject. This view, however, has not been taken by the Courts, who have regarded the Congressional legislation imposing a license fee, as only a species of taxation, without the payment of which the business could not be carried on, but which nevertheless did not propose to make any business lawful which was not lawful before, or to relieve it from any burdens or restrictions imposed by the regulations of the State." Cooley Constitutional Limitations, 721 (5th Ed.).

The tax imposed by the Act of 1889, in so far as it is imposed upon the illegal business of selling pools upon races run upon unlicensed tracks, is not operative as a license, and does not by necessary implication repeal the criminal law affecting such betting. The defendants could not therefore interpose their receipt for this tax as a defense to the criminal charge.

The judgment must be affirmed.