Johnson, J.,
dissenting. After the most painstaking examination which I am able to bestow, I cannot assent to the legal proposition, that the act under consideration is a plain and palpable violation of the constitution.
I dissent from the 3d point of the syllabus, which announces, that inasmuch as the. act requires that every person engaging or continuing in the traffic in intoxicating liquor, without having given the bond provided for in the 2d section, or after such bond has been adjudged forfeited, shall be guilty of a misdemeanor, therefore the act is in conflict with section 18 of the schedule, which prohibits granting licenses for such traffic. *231 To the canons of construction recited by the Chief Justice, the following may be added as equally pertinent. While it is the duty of the court to refuse to enforce a statute that is unconstitutional, yet the repugnance must be clear, necessary and irreconcilable. It ought not to be done, because of a difference of opinion between the judicial and the legislative department, as to questions of public policy or expediency, nor unless the statute, when properly construed, is a plain and palpable violation of the constitution.
It should be both against the letter and spirit of that instrument. So long as there is a doubt, the decision of the court should be in favor of the law. Whenever courts, in doubtful cases, undertake to declare laws unconstitutional, they weaken their just power and may with propriety be accused of usurpation. They lose sight of the scope and province of the judicial department of the government, and trench upon the rights of the people vested in the legislative department. It is the duty of the court in construing a statute to look at the reason of it, and to give it such a construction as will comport with the intention of the enacting power. When that intention is manifest, but is in part defeated by the use of some particular word or phrase, the court should look to the intention rather than the words. Per Hitchcock, J., in Alexander v. McCormick, 2 Ohio, 74, 75; C. W. & L. R. R. Co. v. Clinton Co., 1 Ohio St. 77-82.
Again, a statute must not be construed- so as to nullify or reverse the evident policy of the law, or to render impossible that which it was the obvious intent to render possible; Beaver v. Trustees, 19 Ohio St. 97, 108. And whenever words and phrases have acquired, when used in a constitution, or a statute, a definite fixed legal signification, and are thus- used, the presumption is, that it was meant to use them in that sense. Lieber’s Hermeneutics, 3 ed. 115, 136; Turney v. Yeoman, 14 Ohio, 207. Thus the word “ jury,” in- the- constitution, had its fixed legal sense at common, law,, andi was so used in the constitution. Sovereign v. State, 4 Ohio St. 489; Sedgwick on Stat. & Const. Law, 221, 223, 224 and note.
*232 Further, the mischief to be guarded against by a constitutional provision is to be considered in determining the extent of. the provision, Per Welch, J., in Cleveland v. Frick, 18 Ohio St. 301-3; and such a construction should be given to a constitutional provision, as will make it consistent with other provisions, and harmonize and give effect to all, as a whole. To do this, we have only to suppose the convention used language with reference to its received signification and as it had been practically applied for a long series of years. Hill v. Higdon, 5 Ohio St. 243-7.
Gfuided by the foregoing rules, it is the just province of the judiciary, to annul statutes in contravention of the constitution ; in all other cases, the exercise of this power is not warranted by our theory of government, and is dangerous to the liberty of the people.
With these principles in view, let us inquire : What is the legal signification of the word license, as used in the constitution ? What limitation was thereby placed upon the legislative power? Is the act in controversy, as fairly interpreted, so clearly and palpably a license, within the meaning of that word, as used in the constitution, as to make it the plain duty of the court to declare the act void, and thus nullify the expressed intention of the legistature?
The no-license clause of the constitution, is a limitation upon the general legislative power, to provide against the evils resulting from the traffic in intoxicating liquors. Under the •constitution of 1802, there was no such limitation, and under •that instrument, it was the settled policy of the state, as ■evinced by its enactments during a period of more than fifty years, to regulate, and within certain limits, to prohibit the traffic, except to licensed vendors.
The general features of these statutes are stated in the opinion of the Chief Justice. Under that system of legislation which ■was known as the “ license system,” of regulating the traffic, •the distinguishing features were, that it was a special privilege to a selected few to traffic in the article, while all others were prohibited. The traffic, which was prohibited as a general rule, was legalized by the license. It was a grant of authority and *233 an immunity from the penalties of the traffic. It gave the sanction and protection of law to a privileged class. It was, in short, a dispensation granted to some to retail liquor, and a denial to all others. It legalized the traffic to the extent expressly authorized.
It was the purpose of this clause to abrogate this system, and to place all on a common level, to give no protection or sanction to any, not given alike to all, and to leave the law making power to provide against the evils of the traffic in any method it might see fit, provided always, the protection and sanction of law should not be granted to any one to commit what was a crime in others. The constitution recognizes the fact, that there are evils growing out of the traffic, and that the legislature has authority to provide against them. The only limitation on this power was, that no license to engage in the traffic should ever be granted. Under the no-license system, no man can protect himself from unlawful acts by the shield and panoply of a license, while under the license system he could.
The first exercise of the legislative power under the no-license system, was the act of 1854, to provide against the evils resulting from the traffic in intoxicating liquors ; the last, was the act of 1882, “ To more effectually provide,” &c., against these evils.
Under the act of 1854, certain forms of the traffic were prohibited, all other forms were permitted. Under the act of 1882, and by its 15th section, the act of 1854 is expressly recognized as part of the system. Under both acts, the privileges and immunities, as well as the penalties of the law, have a unif orm operation on all and in every part of the state. Neither act authorizes a violation of law. By comparing these two systems as defined in the statutes of the state, we can ascertain what is meant by this no-license clause in the schedule.
An examination of the series of statutes, beginning in 1792, when this state was under a territorial government, and extending down to the adoption of the present constitution, and a comparison of their provisions with those of the statutes since the adoption of the constitution of 1851, will give a clear and definite idea of the change intended by the adoption of this *234 clause. The one was on the principle of regulating the traffic, by a restricted license to a few to do acts which were crimes in the many, while the other granted immunities to none not allowed to all, and punished all alike for the prohibited traffic. The one, sought to provide against the evils by a license regulation which placed the prohibited traffic in the hands of licensed vendors, who were exempted from the penalties of the law, while the other, so far as it goes, punished all alike for like acts.
This mode of regulating the traffic by the system of licenses, as known and understood by the members of the convention that framed the constitution, was abrogated by section 18 of the schedule. The object was, to change the former policy, and in this respect, to limit the' legislative power over the subject, so that thereafter the protection of positive and express law should never be granted to engage in the traffic. The moral sense of the friends of this clause was shocked at the idea of licensing crime, as they termed the old system. Whether this change of policy was wise or unwise, it is not the province of a court to discuss.
This brings us to the direct question, is the act of 1882, in practical and legal effect, a license within the meaning of that term as used in section 18 of the schedule. The evil to be remedied is an important element in ascertaining this meaning This supposed evil was the sanctioning by law of this traffic in any form.
The word- license, in its common, or as is said in the opinion, in its “ general sense,” is well defined in the second point of the syllabus to be, “ permission granted by some competent authority to do an act, which without such permission would be illegal.” It has other shades of meaning. In its popular sense it is a permission or authority to do an act, which would be otherwise unauthorized.
The problem is, not what the popular, common or general sense of this word is, but what is its legal meaning. In what sense is it used in the constitution? Placing ourselves where the framers of this clause, and the people who adopted it stood, I think it obvious that it meant, to authorize the legislature to *235 provide against the evils of the traffic by any method within the province of the law-making power, except by confiding the authorized t/rajfic to pa/rticular persons. In a constitutional sense a license therefore means a permission or privilege granted to a person to traffic, that is, to buy and sell, intoxicating liquors, under the protection of the law, while others to whom the privilege is not granted, are punished for like acts. If this is the legal meaning of the word, and it will hardly be controverted, then it follows necessarily, that the act of 1882, is neither in form or legal effect a license. The person who complies with the act by giving bond and paying the tax, has no special privilege to traffic in liquors. The acts which are criminal if no such law existed, or if he had not complied with it, are equally so if he complies with the law. It grants no dispensation, special privilege, exemption or immunity. It confers no authority to sell except according to law. The traffic is legal or illegal as defined by the act of 1854 and other statutes independent of this act. In fact, the great objection to the law, urged by its opponents was that it was taxation without protection. A clear admission that the act did not license the traffic.
The act of 1854 makes certain kinds of the traffic illegal. The act of 1882 leaves that act in force, and exempts no one from its penalties, by giving the bond and paying the tax. The expressed intent of this act is, that it shall not be construed to be a license or “ to authorize the sale of intoxicating liquors.” See. 15.
While this legislative declaration of its meaning cannot control the judiciary, where there is no doubt, yet it should have great weight in determining its legal effect, for the rule is, from the words used we must ascertain the legislative intent, the pole-star of all judicial interpretation. The Borealis v. Dobbin, 17 Ohio, 125; Sedgwick on Stat. Const. Constr. 214; Pike v. McGoun, 44 Mo. 491.
The key-note of the opinion is, that the provisions of the 4th section, in its connection with the 1st and 2d' and 5th, make this in legal effect a license.
The 1st section requires every person engaged in the traffic *236 or who shall hereafter engage therein, to pay the amount specified, during the first week in May annually. The 2d requires every such person to give a bond as therein conditioned. The 8d section gives an action on the bond, if payment of the tax is not mad§, and the 4th section makes it a misdemeanor to engage or continue in the traffic without giving the bond, or after it has been adjudged forfeited. Nothing is prohibited by the act except to engage, or continue in the traffic without gwing the bond, or after it has been forfeited.
The penalty imposed is for not giving security to pay the tax. It is only a mode of enforcing the payment of the tax. By complying with the law no emthority is granted to engage in the traffic. Section 15. It is only a condition precedent to engaging in the lawful traffic. This traffic is open to all on the same conditions.
But it is said the 5th section speaks of the traffic where no bond is given as “ illegal,” but as has been said, as to the 15th section, the legislative designation does not vary the legal effect. If the 4th section had read, referring to the 1st and 2d, “ Every such person,” instead of the words used, the meaning would have been the same. It is conceded, that if there had been a penalty merely for the non-payment of the tax, the act would not be a license in legal effect, but that, as the bond is required, it is a privilege granted to engage or continue in the business, otherwise illegal. It is competent for the legislature to say when the tax shall be paid, and what, if any security shall be given, or penalties imposed to insure its payment when due. Such security, or such penalties, are only modes of enforcing a payment of the tax. Such a law does not purport to grant authority to engage in the business. It merely says to all engaging in the business taxed, you must pay or secure your tax, or you will be punished. Such is the uniform construction of similar laws by the very highest authority.
The License Tax Gases, 5 "Wall. 462, are directly in point. The defendants were indicted under section 73 of the act of 1864, to provide ways and means, &e. 13 U. S. Stat. at Large, *237 248. Section 71 provides, that no person, firm, or corporation, shall engage in or carry on certain specified business, including traffic in liquors, until they have paid the tax and obtained a “ license therefor.” Section 72 provides how the application shall be made, and section 73 makes it a misdemeanor, to engage in or carry on such business without such license. By section 78, the licensee is not exempted from the penalties of any state law for engaging in such business.
The parallel between this statute and the act of 1882 is perfect. Section 73 of this statute and section 4 of the act of 1882, are identical in legal effect. They each make it a misdemeanor to engage in and carry on the lawful business without performance of the conditions prescribed. In the one it is a misdemeanor to engage in the business without a license, so-called, which can only be had by payment of the tax in advance. in the other, it is a misdemeanor if the bond is not given in advance to secure the tax.
In the one, the license does not exempt the person from the penalties imposed on the business in any of the states, that is, it grants no immunity from these laws, — while in the other the giving of the bond does not exempt the person from the penalties of the act of 1854, or other penal statutes relating to the traffic. The United States statute calls this tax a “ license,” while the act of 1882 gives it no name, but declares it is not a license. Upon indictments of sundry persons under this act of Congress, the court unanimously held, that, “ The requirement of payment for such licenses, is only a mode of imposing taxes on the licensed business, and that the prohibition under penalties against ca/rrying on the business without license, is only a mode of enforcing the payment of such ta/xes.
In the opinion of that high tribunal, it is said, “ No claim was ever made that these licenses thus required gave authority to exercise any trade or business within a state. They are regarded merely as a convenient mode of imposing taxes.” Again : “ But as we have already said, these licenses give no authority. They are mere receipts for taxesT Hence, though they are called licenses, and though it is a misdemeanor to engage in or carry on the traffic in liquors, without first having *238 obtained them, they are taxes, and though it is a license in form, it is a mere tax receipt.
It was such a misnomer, in the judgment of the supreme court, to call such a law “ a license law,” that Congress, in 1866, amended it in that respect by striking out the word “ license,” and inserting “ special tax.” Thus by the change of one word, the act became in name what it was declared to be in legal effect, a tax law, because the so-called license conferred no authority to engage in the traffic, and therefore was not a license law.
This court, in direct conflict with this high authority, holds, that although the act of 1882 confers no authority to traffic (section 15), yet it is in legal effect a license, because a bond is required to secure the tax.
These License Tax Cases, in another respect, are on all fours 'with the present case. It was there held to be the settled law, that Congress could grant no license to traffic in liquor, or to engage in a lottery in conflict with the laws of the states, regulating or prohibiting the business, because that would interfere with the police power of the states. This was equivalent to a no-license clause in the constitution of the United States, as much as if that instrument had declared, “ That Congress could grant no license to traffic in liquors or to sell lottery tickets.” Now the Revenue Act makes it a misdemeanor to engage in or carry on the business, without first paying the special tax and obtaining the license. This is precisely the scope and legal effect, and almost the identical words of the act before us, and it could not for want of constitutional power, have been'upheld, if that court had held, as this does, that it was a license. To sustain that law, it was necessary to hold, that that act was not a license. This the court did, saying that the fact that the paper issued on payment of the tax was in form a license, did not make it one, that that was only a tax receipt; and the further fact, that it was a misdemeanor, to engage in or carry on the business without the performance of the condition precedent, the payment of the tax, was only a mode of collecting the tax. We are not warranted in disregarding the unanswerable reasoning of this case, much less in *239 saying that, “No question of license was involved.” . The most cursory examination will show to the contrary.
This decision in 5 Wallace, is affirmed in strong terms in Home Ins. Co. v. City Council, 93 U. S. 116. It was the case of an ordinance of the city of Augusta in Georgia, providing for an “ annual license tax on insurance companies.” Prior to the passage of this ordinance the Home Insurance Company had complied with the state law, and held, under a statute similar to our own on that subject, a certificate of authority to do business in the state. This ordinance was passed by the city imposing a “ license tax,” and the Home Insurance Company of New York sought to enjoin the collection of this license tax, on the ground, among others, that the city could not require a second license, as it would impair the obligation of the contract with the state evidenced by the certificate of authority from the state of Georgia. The supreme court of Georgia (50 Geo. 160), had held this so-called license, was not a license but a special tax, and conferred no authority to do business. It was only a tax as a condition precedent to doing business.
The case was carried to the supreme court of the United States, on this question, and that court again unanimously held that such a tax was not a license, but a valid tax imposed by the city, and after repeating what was said in 5 Wallace, adds : “ In the ordinance in question the tax is designated ‘ a license tax,’ but its payment is not made a condition precedent • to the right todo business. No special penalty is prescribed for its non-payment, and no second license is taken out. Had the ordinance been otherwise in these particulars, we have seen, viewing the subject in the light of the License Tax Cases, that the result wotild have been the sameL In view of the foregoing cases, it can hardly be said of them that they “ shed no light on the question before us.” I think they shed a flood of light directly on the question. Neither can it be said of them, “ that the ordinance and legislation under consideration (in those cases), was different from the legislation involved here.” The fact that there was no anti-license clause involved, if conceded, which it is not, is wholly immaterial, as the question there was, as it is here, what is the meaning of the word *240 license, and does a prohibition under penalties against carrying on business until a tax is paid import a license ? Such preeminent authority as these cases are, ought not to be ignored by this court as they have been.
Again, the 3d point of the syllabus holds that this statute, is in its operation and legal effect a license, “ as to the traffic not already prohibited.” It follows, as to the traffic already prohibited, it is not a license law. Therefore, as to all forms of the traffic prohibited by pre-existing law, it is not a license but only an additional mode of preventing such traffic. As to such traffic, it is not a license, and therefore not unconstitutional. To that extent, and as an additional penalty for preventing the prohibited traffic, it should be allowed to stand, though void as to the traffic not already prohibited. The relator in this case does not show or aver that he expects to confine himself to the lawful traffic. Why should he not, even on the concession of the opinion, give a bond for the payment of the amount, in case he engaged in the prohibited business %
Numerous statutes might be cited, to show that regulations prescribed as conditions precedent or subsequent to engaging in a business, and enforcing them by penalties, are not licenses.
Thus section 2778 of Revised Statutes requires foreign express and telegraph companies to return and pay a percentage tax on receipts in addition to the tax on property. By section 2843, if these taxes are not paid, the companies in default were forbidden to do busines in the state.
No one would call this a license statute, but a mode of enforcing the payment of the' taxes due.
The case of Youngblood v. Sexton, 32 Mich. 406, is important, as coming from a state having a constitutional provision similar to ours. It is directly in point and cannot be explained away. The statute was a graduated specific tax on the traffic, with the usual provisions for its collection, and it was made a misdemeanor to neglect to pay the tax, and a penalty was imposed for each‘offense.
That statute was held, Cooley, J., announcing the opinion, to be a tax and not a license. It is sought to avoid the force of this case by drawing a distinction between the Michigan statute *241 and our own by claiming, that under the Michigan statute, the business is not prohibited if the tax is not paid, while in ours it is. This is untenable. In the one, non-payment of the tax when due is a misdemeanor, and no bond is required, while in the other, failure to give the bond, which is merely security to pay the tax, is made the misdemeanor, and failure to pay the tax only subjects the person to an action on his bond.
In the one case, a person is punished for not paying the tax, while in the other he is punished for not giving the bond to pay the tax when due. Legal acumen would be exhausted in making a distinction. The power, by discriminating taxes, as well as by fines, penalties and forfeitures, to provide against vicious and criminal practices, including the evils resulting from the traffic in intoxicating liquor, such as the vice, pauperism and crime it causes, is, as I believe, a part of the legislative power of the state, that ought not to be frittered away or crippled. • The uniform course of legislation in this state establishes the fact, that free trade in intoxicating liquors has never been a part of the public policy of Ohio.
It is equally clear, that the power exists to provide against the evils resulting from this traffic, and nowhere is the right to do so more emphatically asserted than Miller & Gibson v. State, 3 Ohio St. 486, per Thurman, J.:
“ The idea apparently contended for, that the constitution recognizes an uncontrollable, illimitable right to sell intoxicating liquors, is manifestly erroneous. There is no such right in respect to any commodity, however harmless, for if there were, how could the various inspection laws, thg laws relating to markets, the license laws, the Sunday law, &*., be sustained? A power of regulation, a power to provide against evils incident to traffic, a power to protect community against the frauds or dangerous practices of trade, is, in a greater or less degree, vested in every government, and certainly the people of Ohio are not wholly without this protection. “ If to guard against these evils, some restraint upon the traffic itself is necessary, it may lawfull/y be imposed,” the fact being always borne in mind, and always acted upon, that the power is a power to regulate, and not to destroy. To this power, intoxicating liquors *242 are expressly subjected by the contitutional provision I have quoted: but were that provision st/riclten out of the constitution, the power would yet subsist / and for the same reason that it might be declared unlawful to sell poison to a child, or a dagger to a madman, it might be made an offense to sell intoxicating drink to á minor or a drunkard; and for the same reason that any other common nuisance might, by law, be abated, the business of a common tippling house might be subjected to that fate.”