Okey, J.
I am unable to concur in the judgments rendered in-these cases. In my opinion judgment should be rendered in State v. Frame in favor of the defendant, and in Benner v. Bauder the judgment should be reversed and the relief demanded in the petition granted. The infirmity which, in State v. Hipp, 38 Ohio St. 199, we held to be fatal to the act of 1882, was transmitted to the act of 1883. Parent and child are like affected. Believing the act of 1883 to be unconstitutional, respect for the general assembly which enacted it, and for the majority of this court which has maintained its validity in an able opinion, demands that I should state my own views upon the subject.
In the majority opinion it is asserted that, under the constitution as it is, the general assembly has the power to pass a prohibitory liquor law. Considerable space is occupied upon the subject, and reliance is place:! on Burelcholter's ease, which *418 sustained' legislation directed against tippling houses, but has always been supposed to be in harmony with Miller v. State, 3 Ohio St. 475, and what was said by Thurman, C. J\, on page 485 et seq. No question as to the power to pass prohibitory laws was presented in either of the cases now before us, and therefore I have not considered any such question. The act of 1883 is not a prohibitory liquor law. No statute ever passed in the State was so unlike such a law. Why, therefore, consider the constitutionality of a prohibitory law? An opinion that such a statute would be constitutional is a mere obiter dictum,. It goes forth without authority, settles nothing, and nobody is bound by it. If the legislature passes a prohibitory liquor law, and its constitutionality is assailed in this court, I will then be willing to consider its validity. In the cases now before us I will confine myself to an examination of the question whether the act of 1883 is a license law.
The act of 1831 (3 Curwen, 2424), was in force when the convention which framed the constitution finished its labors. That act was called and known as a license law, but no authority to buy or sell liquors was granted by it or under its authority. Iudeed, no such authority has ever been necessary. The common-law right possessed by every person to buy and sell liquors of every sort at pleasure, is not interfered with in any respect by our constitutions,1 federal or state. Restraints upon the traffic can only be imposed by constitutional provision or under legislative authority, and legislative authority may be general or restricted under organic law. The act of 1831 provided, “ That if any person shall keep a tavern or retail spirituous liquors, or shall vend or sell any spirituous liquors of any kind to be drank at the place where sold, or shall vend or sell such spirituous liquors by less quantity than one quart,” without being duly licensed as a tavern keeper, he should be fined not exceeding one hundred dollars nor less than five dollars, on conviction upon indictment. By the same act, power %vas conferred on the court of common pleas to grant (3 Cur-wen, 2424) or refuse (2 Curwen, 1076), to applicants, licenses to keep taverns, but such license could only be granted when the court was satisfied, among other things, that such tavern *419 was necessary, and that the applicant was a man of good moral character and a suitable person to keep a tavern, and that he was provided with suitable accommodations for such purpose. The charge for such license was not more than fifty nor less than five dollars per annum, the court, in fixing the amount, “ having proper regard for the applicant’s place of business.” A paper called a license was issued to such tavern keeper by the clerk of the court, on payment of his foe of fifty cents . therefor.
Nothing is clearer than that the privilege secured to a tavern keeper, under the act of 1831, was neither exclusive, unrestricted, nor beyond legislative control. That there was an attempt, even indirectly, to grant any exclusive power to deal in liquors is not pretended-; for the right, existing in all persons, to sell to another liquors of any sort, in any quantity not less than one quart, where the liquor was not to be- drunk at the place where sold, was untouched by any statute then in force. That such privilege was not unrestricted is manifest; for if such tavern keeper permitted any kind of rioting, reveling, intoxication, or drunkenness on his premises, he was subject to criminal prosecution and his license was revoked. And that legislative control existed cannot be doubted, for the general assembly might not only deny the power to issue licenses in the future, but revoke all existing licenses. Hirn v. State, 1 Ohio St. 15; Cooley’s Con. L. (5th ed.) 343.
Such, in substance, was the condition of the statute law, in relation to the traffic in intoxicating liquors, at the time stated, that is, in March, 1851, when the convention which framed the constitution finished its labors. The result of this legislation was apparent. While the right to traffic in liquors was not in terms granted or authorized to be granted to anybody, yet the effect of the statute was to reserve to licensed tavern-keepers the exclusive right to sell spirituous liquors to be drunk at the place where sold, while the right of all persons to deal in liquors, in such other way as they might see proper, - was left practically undisturbed. The subject of such traffic was, however, agitated throughout the state during the winter of 1850-51, and a large number of the members of the con *420 stitutional convention, and a majority of the members of the general assembly, then in session, were opposed to such license system. The convention submitted to the people for their ratification the constitution which had been framed, and also submitted to a separate vote the following provision, which was to become part of the organic law if ratified: — “ No license to traffic in intoxicating liquors shall hereafter be granted in this state, but the general assembly may provide by law against evils resulting therefrom.” Schedule, § 18. The separate provision, as well as the constitution, having been ratified by the people, such separate provision became part of the organic law. Meanwhile, the general assembly had, on March 12,1851, repealed so much of the act of 1831 as operated as a license to sell liquors. Hirn v. State supra. This left in force the penal provisions of the act of 1831, without the exception in favor of tavern-keepers, so that thereafter it was a penal offense for any person to sell spirituous liquors to be drunk at the place where sold.
Por more than thirty years after the adoption of the constitution, no statute in principle like the act of 18S3 was passed. This, of course, is not conclusive against the existence of the power so to legislate; but it must be remembered that during all that time the subject was constantly agitated, and the absence of legislation of this character affords evidence that the general opinion was against the authority to pass such an act; and the constitutional provision means the same thing to-day that it meant when it was adopted. That the early opinion against the existence of- such power was correct, is a proposition to which I fully assent. In providing that licenses to traffic in intoxicating liquors should not be granted, the evil supposed to exist and sought to be remedied was not the granting of licenses as applied to every kind of business. Indeed, the express prohibition of liquor license recognizes power in the general assembly over the general subject. Accordingly, as stated in the opinion of the majority, “ burdens in the form of license taxes may be imposed on certain classes of business, which in their nature are injurious to the public welfare.” And see 38 Ohio St. 225; Commonwealth *421 v. Bacon, 13 Bush, 210; 6 Southern L. Rev. N. S. 74. Nor was it supposed to be an evil, when the constitution was framed, that men obtaining licenses which exempted them from punishment for selling liquors by the drinlc, were required to produce evidence of good moral character; nor that the price of the license was regulated by the amount of business done; nor that licenses, being granted alone to tavern keepers, ■were confined to a small number or class of persons. But the evil supposed to exist, and against which the constitutional provision was directed, was the sale, by any person, of spirituous liquors by the drink, for that was the license, and all there was of it — that was the privilege, and the only privilege with respect to liquors, secured by such license. And this being true, it is too clear for argument that if it was sought by such constitutional provision to cut off such privilege to the few, much more was it intended to absolutely deny it to the many. The notion that the exclusive right to one man or a class of men to carry on a business is implied in a license, is utterly fallacious. A license may be confined by the lawmaking power to a class or limited number of persons, or it may extend to all who will comply with the conditions imposed. Take the case of a peddler, who desires to travel throughout the state and vend goods, wares and merchandise, lie is required to pay money, the amount being determined by his mode of travel, whether on foot, on horseback, or in a wagon, boat or railroad car; but anybody who tenders the required sum is entitled to a license, and may enforce the issuing of the same. Rev. Stats, sections 4397-4402. The same thing is true as to other licensed employments. See 80 Ohio L. 129. And if it was made by a statute mandatory upon the court of common pleas to grant and issue a license to each and every person who applied therefor, and paid a license fee of $200, authorizing him to sell spirituous liquors by the drink for one year, could any man be found bold enough to say that such a statute would not be in conflict with the constitutional inhibition on the subject? Such a law would be simply extending to many the authority which was thought to be an evil even when confined to a few ; and hence the claim that such a law *422 is valid because tbe license was open to all, would be plainly absurd.
We come now to consider tbe condition of tbe statutes, in relation to tbe traffic in liquors, in force in 1883, at tlie time the act here under consideration was passed-. As under the license system, there was then little restriction on the sale of liquors which were not to be drunk at the place where sold. Indeed, the only restriction upon such sales had relation to particular times, places and persons, as sales on Sundays and days of election, or in the vicinity of certain religious meetings, or the like, or to minors, except on permission, or to dissipated persons. Municipal corporations then had power to regulate, but none to prohibit beer, ale, porter and tippling houses, and a dealer in liquors was taxed, in addition to the license fee exacted by the general government, in the same way as a grocer or like dealer, and not otherwise. The leading and far most important statutory inhibition then in force was the provision which was directed against the sale of spirituous liquors by the drink. By force of that provision, which had retained substantially the same form during our entire existence as a state and a portion of our existence as a territory — a period, indeed, of more than ninety years — it was a crime, and punishable as such, for any one not licensed to sell spirituous liquors by the drink; and, of course, since 1851, the inhibition has been general, for no license could constitutionally exist. True, in portions of tlie state the provision against such sales, like that against profane swearing, and some others, was not strictly enforced, but in other parts of-the state it was enforced, and official reports will show that the convictions in the state, outside of the large cities, for such illegal sales have, for several years, greatly outnumbered the convictions for any other offense.
And this historical review brings me to the consideration of the act of 1883 (80 Ohio L. 164), and to the determination of the question as to its constitutionality. The act provides for an assessment upon the business of trafficking in intoxicating liquors. The amount of this assessment is $200 a year whore the person is engaged in the general traffic in liquors, *423 and $100 a year where the traffic is confined to malt and vinous liquors. The persons so assessed are those who carry on such traffic in premises of which they are owners, and those who, not being owners, carry-'on such traffic on the premises of others with their consent in writing. All others carrying on such traffic are engaged in an unlawful business, and punishable criminally therefor. The statutes imposing restrictions upon the traffic remain, in their general features, the same as before the passage of the act of 1883, except in certain particulars. Municipal corporations have, under this act, power to prohibit, whereas before they only had power to regulate, beer, ale, porter and tippling houses; but it is provided that “ if any municipal corporation shall prohibit, ale, beer, and porter houses withiu the limits of such corporation, a ratable proportion of the tax paid by the proprietors thereof for the unexpired portion of the year, shall be returned to such proprietors.” § 9. This provision was doubtless suggested by the remarks of Bartley, J., in Hirn v. State, supra, in which he speaks of refunding in case of the revocation of a liquor license. Bower seems also to be granted to municipal corporations to suspend the operation of the statute prohibiting the sales of liquors on Sunday. But the great and important change made in the legislation on the subject is that the provision against the sale of spirituous liquors by the drink, which had remained in force so long that no man now living can remember when it was enacted, is in terms repealed by the act of 1883. If that act is valid, it will hereafter be as lawful for one taxed as a dealer in liquors to sell brandy to-be drunk as a beverage at the place where it is sold, as to sell wine for medicinal or even sacramental purposes ; and if it is true that there are five thousand such taxed persons, it follows that there are to-day five thousand places in Ohio where spirituous liquors are lawfully sold by the drink, whereas, for more than thirty years before the passage of this act, there had not been one such place in all the state. These remarks are made in no censorious spirit-phut solely for the purpose of showing that the act under consideration is, in its operation and'effect, a license law; for I agree that the legislature is the *424 sole judge as to the form and even justice of its legislation, if no provision of the constitution is infringed.
In the discussion of State v. Hipp, and also in the consideration of these cases, it was ably and zealously argued that the framers of the constitution, who prepared the provision here under consideration, and the people who ratified it, must have had in their minds the licenses granted and issued under the act of 1831, and none other, and hence that a statute upon the subject which did not in terms provide for granting and issuing such license, in substantially the same way as under the act of 1831, cannot be in conflict with the constitutional provision against licenses. This view.was evidently adopted by the general assembly, as a fair interpretation of the constitution, in the passage of the act of 1883. But that this construction of the constitution would render the inhibition practically nugatory, and therefore is erroneous, was distinctly decided in State v. Hipp, and I understand the majority opinion, in form, to approve that decision, and to reject the view of the constitutional provision which seems to have met the approval of the legislature. True, the judge delivering the opinion refers to passages in State v. Hipp, in which the act of 1882 is said to be (with certain exceptions) a prohibitory liquor law as to all dealers failing to comply with its terms, and it is claimed that this was the ground upon which the act of 1882 was held tó be invalid. But with great respect for the opinion of the majority, I must be permitted to say that this is very misleading, as it places State v. Hipp on ground which the couit never intended 'to occupy. We never had in this State a prohibitory liquor law. The act of 1882 permitted the sale of liquors for medicinal and mechanical purposes, and that act was prohibitory, with these exceptions, as to all persons who failed to comply with its terms ; but every person had the right to comply with the conditions, and thereby obtain the privilege of freely trafficking in liquors, with the restrictions imposed by the statute The act of 1883 is, with similar exceptions, a prohibitory law as to all persons who fail to furnish real estate security for their assessments; but everybody has the right to furnish such security, and thereby obtain far greater privileges than could *425 have been secured under the act of 1882. Any attempt, however labored, to distinguish between those acts in 'this respect, in any matter of principle, will necessarily fail. In the opinion as to the validity of the act of 18»2, I endeavored to state fully the effect of the various provisions of the act, and properly characterized the act as being prohibitory in the sense I have stated ; but this was not done as furnishing any test by which to determine whether an act is or is not a license law, or whether the act of 1882 was or was not constitutional. The act of 1831, which was the license law in force when the constitution was framed, permitted all persons to sell liquors of any sort, in any quantity not less than one quart, where the liquor was to be taken from the place where purchased, leaving to the tavern keeper, who was licensed, as his only exclusive privilege, the right to sell by the drink. The act was a license law, but it would have been plainly absurd to call that act a prohibitory liquor law; nor has it ever been supjwsed, that in order to constitute an act a liquor license law, it was necessary that it should be a prohibitory liquor law in any sense or under any condition. Fortunately the ground upon which State v. Hipp was decided is expressed too clearly in the syllabus or head note to admit of doubt or question ; and the syllabus or head note is with us the test as to the point decided. It was there held, that the constitutionality of a statute depends upon its operation and effect and not on the form it may be made to assume ; and that the act of 1882, which required every person engaged or engaging in snch traffic to pay a specified sum of money annually and execute a bond as therein required, and also provided that “ every person who shall engage or continue in such traffic, without having executed the bond ... or after his bond shall have been adjudged forfeited . . . shall be deemed guilty of a misdemeanor,” was, in its operation and effect, as to the traffic-not theretofore prohibited, a license, and hence unconstitutional. Besides, an examination of the opinion will show that the absence of a clause providing for granting and issuing licenses, and the absence or presence of a clause which rendered the act, under any circumstances, a prohibitory *426 liquor law, were regarded as matters wholly immaterial to the question whether the statute was or was not a license law or a constitutional law.
As the act of 1883 provides, in effect, that the persons who submit to a tax of two hundred dollars a year, and give real estate security for its payment, either as owners or by written consent of the owners, shall have the exclusive right of selling alcoholic liquors to be drunk as a beverage at the place where sold — which was the only privilege secured by a liquor license under license laws — such act is plainly and necessarily a license law, and as such, unconstitutional, and the infirmity destroys the whole, act. But I may well place my dissent on narrower .ground. One who is the owner of real estate may pursue the traffic thereon without the consent of anybody. By pursuing the traffic he invokes the tax, which becomes a lien on such property. But this is not true of a tenant. If he carries on the traffic without the consent, in writing, of the owner of the real estate in which the business is done, he becomes a criminal, and is punishable as such. This, it is held, does not apply to persons holding leases at the time the act was passed; and I agree to that, upon the ground stated by the majority, and upon other grounds; but for reasons -which will now be stated, I need not speak further of such existing leases. The requirement that a tenant must procure such written consent of the ■ owner, applies to all persons who obtain leases after as well as those who obtained leases before the passage of the act, and' there can be no lien for an assessment on premises occupied by a tenant without the written consent of the owner. Besides, unless such written consent be in terms given by the owner in the lease, or be in terms given by the owner by a separate writing, the holder of a lease, whether as lessee, assignee or sub-lessee, though the lease be executed since the passage of the act, and whatever its terms, commits a criminal offense by carrying on such traffic in the leased premises. Act of 1883, § 2; State v. Hart, 4 Ired. L. 246; Bishop on W ritten Laws, § 237 ; and see Jenkins v. Clarkson, Headington v. Neff, 7 Ohio, 1 pt. 72, 229. The state says, in substance, to the tenant, procure the written consent of-the ow.ier, so that his prop *427 erty will become security for your assessment, and you may sell alcoholic liquors by the drink, and thus secure all the privilege there ever was in a liquor license; but if you carry on the traffic without such written consent, whereby the state will bo deprived of real estate security for your assessment, you shall be punished as a criminal. That, in my opinion, clearly constitutes this act a license law, and for so saying State v. Hipp is direct and conclusive authority, and the decision in that case is plainly in conflict with this case. To be sure, an attempt is made, in the opinion of the majority, to answer this view of the case, but with great deference, I submit the attempt has been entirely unsuccessful. First, it is said the provision requiring such written consent, no more renders the act a license law than the act of 1854 was rendered such law by the clause prohibiting sales to minors except upon the written order of their parents, guardians, or family physician.. But the difference is very marked. The requirement that a sale could only be made to a minor on such order was a mere regulation, which left in the dealer the right to traffic in liquors; but one who is not the owner of real estate is absolutely prohibited from dealing in liquors in any way, without the written consent of the owner of the property in which he proposes to carry on the business. There is no analogy between the cases. A similar argument was made and overruled in State v. Hipp, and what was then said (38 Ohio St. 228) is equally an answer to the claim nowmade. Secondly, it is said, that even if the provision requiring such written consent should be regarded as unconstitutional, the remaining portions of the act may stand. But I deny that any part of the act can stand, if the clause requiring such written consent constitutes the act a license law as to tenants. The policy of the act is that all assessments shall bo secured by a lien on real estate, and the necessity for such lien is far greater, ordinarily, where the dealer is a tenant than where he is the owner, of the property. It is not to be assumed, nor do I believe, that the general assembly would have granted to all persons dealing in liquors who were tenants, and all such dealers as might become tenants, who will always constitute the great majority of dealers, the *428 right to sell alcoholic liquors by the drink, without requiring any security for their assessments, and at the samo time have provided that no owner of real property should traffic in liquors thereon without pledging such property as security for his assessments, While undoubtedly an act may be constitutional in part and in part void, this clearly is not such an act. The rule upon the subject is correctly stated by Mr. Bishop, as follows : “If the unconstitutional parts are essential to the constitutional, all must fail,” and “if the parts are so mutually related as to make it evident the legislature intended them to constitute orre whole, so that if all could not be carried into effect none would have received the legislative sanction, the case is within the same rule.” Written Laws, section 84. Shaw, C. J\, expresses the rule in the same way in the leading case of Warren v. Charlestown, 2 Gray, 84, which has been followed in the same court (Jones v. Robbins, 8 Gray, 329, 339; Sparhawk v. Sparhawk, 116 Mass. 315), and expressly approved by this court. State v. Perry County, 5 Ohio St. 497; 38 Ohio St. 230. The cases cited in Cooley’s Const. L. (5th ed.) 211, 216, are not in conflict with this rule.
If I entertained doubt as to the constitutionalit}'- of the act of 1883, I would xxnhesitatingly unite with the majority of the court in sustaining it. The rules on the sxxbject by which I am guided are stated in 38 Ohio St. 219. To hold an act to be invalid where its xxnconstitutionality does not clearly appear, would be almost as unwarranted and pernicious as to sustain an unconstitutional statute upon the ground that its enforcement would bring to the public treasury a large revenue. But I have no doubt on the subject. The statute is unconstitutional, and in my opinion plainly so. If the legislature had passed an act which was in terms a license law, how woxxld it have differed in principle, in practical operation, or in legal effect, from the act of 1883 ? I answer, there would have been no difference in either respect. I am best satisfied with the broad ground I have stated ; but the narrower ground, that the provision requiring of tenants written consent of owners is fatal to the acts is entirely tenable, and is fully supported by State v. Hipp, which is in effect overruled by this decision.
*429 Counsel who maintain the validity of the act of 1883 insist that, notwithstanding the inhibition against licensing such traffic, the business of a dealer in liquors may be taxed under any act which will not be in effect a license law, and they rely on Youngblood v. Sexton, 32 Mich. 406; 46 Mich. 183. On the other hand, opposing counsel insist that the act is in conflict with other provisions of the constitution than the clause prohibiting licenses. But the view' I have taken of the cases relieves me from the consideration of any of those questions. Nor do I find it necessary, or even proper, to express any opinion as to the wisdom of the constitutional provision prohibiting liquor licenses, — as to the propriety of a change of the organic law in that respect, — as to the wisdom, propriety or justice of the act of 1883, apart from the constitutional objection to it. I place this opinion solely on the ground that the act of 1883 is, in its ’ operation and effect, a license law, and hence in conflict wdth the constitution, and being unconstitutional, such act is neces-' sarily wrong and oppressive.